PREFERRED MEAL SYSTEMS, INC., *et al.*, Plaintiffs-Appellants, v. K. LEE GUSE *et al.*, Defendants-Appellees.

First District (2nd Division) Nos. 1—88—3335, 1—88—3498 cons.

Opinion filed May 29, 1990.

712

James A. Hardgrove, Kathleen C. Kauffman and Monica Rimai, all of Sidley & Austin, of Chicago, for appellants.

Eugene E. Gozdecki and Howard A. Voeks, both of Gozdecki & Zido, of Chicago, for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiffs, Preferred Meal Systems, Inc. (Preferred), and its parent corporation TW Services, Inc. (TWS), brought suit to obtain equitable relief and monetary damages against the three highest-ranking former officers of Preferred, defendants Guse, Singer, and Reynolds. Plaintiffs charge that the individual defendants used their corporate offices with Preferred to establish a competing corporation, defendant Excel Systems, Inc. (Excel); that Guse violated an agreement not to compete contained in his employment contract; and that all three individual defendants breached their fiduciary duties to Preferred by wrongfully appropriating and using Preferred money, property and confidential information in order to compete with it, and by successfully soliciting its employees and customers in behalf of the new company, both prior to and after their departure from Preferred.

After hearing evidence and argument of counsel, the trial court on June 21, 1988, entered a temporary restraining order (TRO) enjoining defendant Guse from engaging in competition with Preferred or consulting in any way with Excel. The TRO also enjoined all defendants from using or disclosing confidential information obtained from Preferred and from soliciting additional Preferred employees.

Upon hearing Preferred's evidence on its request for a preliminary injunction, the trial judge on October 12, 1988, declined to enjoin Singer, Reynolds and Excel from engaging in competition with Preferred, but kept in effect the order against them regarding confidential information, and continued the injunction against Guse pending further hearing. On November 16, 1988, at the close of the continued hearing, the court modified the previous order against Guse by permitting him to compete with Preferred for the business of all customers who contract pursuant to public bid. Plaintiffs appeal from the order denying full preliminary injunctive relief against Singer,

Reynolds, and Excel, and from that portion of the modified injunction against Guse permitting him to compete with Preferred in instances where the award of a contract is based on competitive bidding. The case is brought here on interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (73 Ill. 2d R. 307(a)(1)), and the following issues are presented for review: (1) whether the trial court's decision to modify the injunction against Guse, permitting him to compete with Preferred for the business of all customers who contract pursuant to public bid, was against the manifest weight of the evidence and contrary to law; and (2) whether the trial court's decision to refuse to enjoin Reynolds, Singer and Excel from engaging in competition with Preferred was also in error.

The facts in this case, many of which are contained in documentary form, are essentially undisputed.

NATURE OF PREFERRED'S BUSINESS

Preferred furnishes "pre-plated" or "pre-portioned" meals to both private and public school districts, but since school consumption is limited to 175 pupil attendance days each year, Preferred has diversified its operations by catering to senior citizen nutritional programs and day care centers. With just under $40 million in annual sales, Preferred is not without competition in this $3 billion market.

PLAINTIFFS' CONFIDENTIAL INFORMATION

Plaintiffs assert that their confidential information includes food formulas, customer lists, all costing and pricing information, standard costs, operating statements, bills for materials, and information relating to gross margin and returns; that hard copies of such confidential information were required to be kept under lock and key by Preferred managers in order to safeguard the information and names; that passwords were used to control computer access; and that Preferred made this information available only to select employees on a need-to-know basis.

DEFENDANTS' POSITIONS WITH PREFERRED

Defendant Guse was president and a director of Preferred. Defendants Singer and Reynolds were vice-president in charge of sales and vice-president of administration, respectively. As sales vice-president, Reynolds was responsible for obtaining and maintaining clients. As administration vice-president, Singer had primary responsibility for Preferred's financial operations, including the preparation of all major bids and contract renewals. The three individual defend-

ants, together with Michael Alagna, operations vice-president, had almost total control over Preferred's operations, had complete access to all of Preferred's confidential financial and customer information, and knew Preferred's customers, costs and bidding strategies. Together they operated Preferred on their own, without detailed direction from Canteen Company (Canteen), the division of plaintiff TWS responsible for Preferred. Defendant Excel is the corporation which defendants formed to compete with Preferred; Guse, Reynolds and Singer own all of its stock.

GUSE'S EMPLOYMENT CONTRACT

In his contract of employment with Canteen, Guse agreed that he would not at any time, either while employed or thereafter, disclose any of Preferred's confidential information or trade secrets. The contract further provided that, for a period of one year after his termination, Guse would not

> "directly or indirectly, as an officer, director, stockholder, partner, associate, employee, consultant, owner-agent, creditor, coventurer or otherwise, become or be interested in or be associated with any other corporation, firm or business engaged in any geographical area in which [Preferred] or any of its subsidiaries, affiliates or licensees is so engaged, in the same or any similar or competitive business with that of [Preferred] or any subsidiary, affiliate or licensee."

THE EVENTS COMPLAINED OF

In January and February of 1987, Guse, Reynolds and Singer met with the accounting firm of McGladrey, Hendricksen & Pullen (McGladrey) to seek advice about the possibility of doing a leveraged buyout (LBO) of Preferred, the purpose of which was to make Preferred a minority business enterprise (MBE). At this time, defendants furnished certain information, which included balance sheets, costs and margins for Preferred's top 20 accounts, to McGladrey. Defendants did not further pursue the concept of a LBO until December 1987, at which time they solicited Michael Alagna and Jose Seijo to join their management group, but they declined and chose to stay with Preferred. When defendants became concerned about the possibility of being discharged for their having suggested a LBO to plaintiffs, they developed a contingency plan under which they would form their own company should that event transpire; accordingly, they began planning for the new company while still employed by Preferred, using Preferred's data and computers. Guse admits work-

ing on the contingency plan to start a new company in late January or early February of 1988, but maintains that it was shelved between mid-January 1988, when the Harris Bank declined to finance the new company, and May 18, 1988, when defendants began to leave Preferred. Certain versions of plans for a start-up company were found on Preferred computers with file generation or last revision dates of March 23, 1988, and May 17, 1988.

In January and February of 1988, Guse formalized an offer to his superiors at Canteen regarding a LBO of Preferred, making his initial presentation to the president of Canteen on February 11, 1988. In response to the proposal, Canteen sought a 40% equity ownership in the new company. However, Guse's professional advisors expressed concern that such a percentage of ownership might result in the company's not receiving MBE status in light of the fact that Canteen owned Preferred previous to the proposed buyout.

Defendants then made two offers, both of which were rejected as being too low and also because they failed to give Canteen any equity ownership. Soon after the second offer was rejected, defendants solicited certain of Preferred's key managers on behalf of the new company. Michael Alagna was contacted for a second time, on May 6, 1988, by Guse and Singer, who told him that they planned on forming a company which would compete with Preferred, and that they wanted him to join them. Reynolds contacted Pat Costello, one of three regional sales managers and offered him a position with Excel. Guse contacted Jerry Feddor, a plant manager; Jose Seijo, plant engineer (the second such contact); and Nick Lindheim, a regional sales manager, offering each employment with the new corporation. Guse also offered other less prominent employees positions with the new company, including technical services director Fischer, senior nutritions program head Lykke, and material manager Steffens. In addition, the following employees left Preferred within days of defendants' departures and became employees of Excel without any prior notice to Preferred: client service manager Rose, regional manager Williams, administrative assistant Schar, product development manager Reigler, and client service representative Reitz.

Defendants Guse and Singer left Preferred on May 18, 1988; on May 19, 1988, they began looking at temporary office space; and on May 20, 1988, Singer made a deposit on a two-room office with secretarial services in Itasca, Illinois. In early May 1988, Guse and Singer used Preferred funds to pay approximately $20,000 in fees to the law and accounting firms which rendered services in connection with their plans to buy out Preferred, despite the fact that TWS had spe-

cifically informed them that Preferred would not pay for these services. Guse and Singer also ordered, paid for with almost $10,000 in Preferred funds, and later took with them two Model 50 computers; Guse testified that he planned on keeping them only until he received the money due him from Preferred's retirement fund. However, defendants returned this equipment on advice of their counsel shortly after this suit was filed. Defendants also caused a binding machine to be taken from Preferred and which was used by Excel, but defendants ultimately reimbursed Preferred for it.

Preferred employees Costello, Feddor and Fischer all testified that before leaving their employment, defendants had made statements that they had spoken with Preferred customers and that there were potential customers for the new corporation.

## I

### A

■■ ■ Plaintiffs argue that the trial court's decision to modify the injunction against Guse, permitting him to compete with Preferred for the business of all customers who contract pursuant to public bid, was against the manifest weight of the evidence and contrary to law. In *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524-25, 440 N.E.2d 117, our supreme court defined the role of our reviewing courts in considering appeals from decisions rendered in preliminary injunction cases as follows:

"The appellate court, in *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, summarized the role of the preliminary injunction and the nature of the review on appeal from an order issuing such an injunction when it stated:

'It is well established that a hearing on a motion for a preliminary injunction does not determine any factual issue. A preliminary injunction is issued to preserve the *status quo* until the trial court may consider the merits of the case. In ruling on a motion for such relief, controverted facts or the merits of the case *are not decided.* [Emphasis in original.] In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be

kept in *status quo* until the case can be decided on its merits. In sum, the only question before us is whether there was a sufficient showing to sustain the order of the trial court. [Citation.]' *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33.

In this case we do not feel limited by the traditional scope of review of an order issuing a preliminary injunction. Although the order in this case purports to be a preliminary injunction and many references are made in the order to the fact that the court is only preserving the *status quo* until there can be a hearing on the merits, this order is, in effect, a decision on the merits of the case. It should be noted that the transcript of the hearing on the motion for the preliminary injunction is in excess of 4,000 pages. Approximately 28 witnesses testified, and more than 80 exhibits were introduced. The hearing lasted approximately 15 days." 91 Ill. 2d at 524-25, 440 N.E.2d at 120.

Similarly, in the case at bar the transcript of the hearing on the motion for the preliminary injunction covers approximately 1,200 pages, the trial court heard from more than a dozen witnesses over parts or all of 10 different days, and considered 14 depositions, 6 affidavits, and 114 exhibits. Moreover, the parties thoroughly briefed the issues for the court. Therefore, as the supreme court did in *Dixon Association*, we consider the orders of the trial court in this case to be, in effect, decisions on the merits of the case, and the scope of our review will be so governed. (Accord *Warrior v. Thompson* (1983), 96 Ill. 2d 1, 449 N.E.2d 53; *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.) Consequently, we are bound to the standard of determining whether the trial court's findings are contrary to the manifest weight of the evidence and whether it has misconstrued or misapplied the pertinent law. *Dixon Association*, 91 Ill. 2d 518, 440 N.E.2d 117; *Witter*, 132 Ill. App. 3d 273, 476 N.E.2d 1123.

Our courts have uniformly and consistently held that in an action for preliminary injunctive relief, a plaintiff must show (1) a clear right or interest needing protection, (2) the absence of an adequate remedy at law, (3) irreparable harm if the injunction is not granted, and (4) a reasonable likelihood of success on the merits. *McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 1050, 486 N.E.2d 1303; *Cross Wood Products, Inc. v. Suter* (1981), 97 Ill. App. 3d 282, 284, 422 N.E.2d 953, 956.

While it is true that ordinarily an employer has no proprietary interest in its customers (*Instrumentalist Co. v. Band, Inc.*

(1985), 134 Ill. App. 3d 884, 892, 480 N.E.2d 1273, 1279; *Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 448 N.E.2d 947), in the case of covenants not to compete Illinois courts will enforce a reasonable restriction on future competition by employees so long as the restriction is reasonably necessary to protect the interests of the employer; accordingly, a restrictive covenant is enforceable if either (1) the employer has a near-permanent relationship with its customers; and, but for the employment, the employee would not have had contact with the customers (*McRand*, 138 Ill. App. 3d at 1051, 486 N.E.2d at 1311), or (2) the employee has acquired confidential information in the course of his employment (*Instrumentalist*, 134 Ill. App. 3d at 892, 480 N.E.2d at 1279; *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 292, 389 N.E.2d 1300, 1307).

The trial court found as to all defendants that plaintiffs satisfied the requirements for a preliminary injunction regarding irreparable injury, the likelihood of success on the merits, and the absence of an adequate remedy at law. The court further found that the restrictive covenant in Guse's employment contract was reasonable in terms of geographic scope and duration, but it declined to enforce the clause for its full one-year term only because it found that the evidence did not establish Preferred's protectable interest in either its public sector customers or its business information, although, as noted above, all defendants were enjoined, both after the TRO and the preliminary injunction hearings, from using or disclosing any confidential information obtained from Preferred. We hold, however, that the ruling with respect to a protectable interest as to Preferred's public sector customers was in error as to both fact and law, for the undisputed evidence shows not only how Preferred obtained its customers, but also how it was able to retain them. In holding as a matter of law that a near-permanent relationship could not exist where awards of contracts are based on public bidding, the judge stated:

> "And somehow, I just find foreign to the concept of protectable interest the situation where in order to be awarded the contract, you have to go through a competitive bidding process."

The judge further noted:

> "Certainly, I don't know if I have any evidence of a, quote, near permanent relationship. To me a near permanent relationship, I don't know how a near permanent relationship could coexist in a public bid situation because if, in fact, you, quote, have a near permanent relationship, then you may as well forget the fact that you have something up for public bid. *** So

how you could have a near permanent relationship coexist in a public bid situation to me would mean that the public bid situation is not being run the way it should."

The judge made these remarks largely in citing, *sua sponte*, and discussing the case of *Service Systems Corp. v. Van Bortel* (1988), 174 Ill. App. 3d 412, 528 N.E.2d 378, which cites *McTaggart v. Service Systems Corp.* (7th Cir. 1986), 785 F.2d 312.[1] The trial court in *Van Bortel* denied plaintiff's requests for a temporary restraining order and a preliminary injunction and dismissed its complaint. Plaintiff Service Systems was a corporation engaged in providing food management services to a variety of clients, including schools, businesses, and government institutions. Defendants were former officers and employees of plaintiff who had entered into covenants not to compete with plaintiff, which plaintiff sought to enforce. The appellate court in *Van Bortel* found the issue to have been decided in *McTaggart*, which, although involving the same company, was brought against a different employee under an identical covenant not to compete. And although it based its opinion on the doctrine of collateral estoppel, *Van Bortel* quoted the *McTaggart* court's opinion, which declined to enforce the covenant not to compete on the basis that

" '[g]iven the competitive bidding process by which defendant's customers place their business, there is no indication that these customers do not rely solely on price. There is some evidence that non-price factors, such as customer service, play some role in the customer's decision to accept the bid, though the significance of this factor is far from clear. But defendant has not shown that plaintiff developed an established relationship with a customer and learned about the customer's particular needs to the degree that, but for his employment and the defendant plaintiff would be in no position to acquire these customers.' " (174 Ill. App. 3d at 417-18, 528 N.E.2d at 382, quoting *McTaggart*, 785 F.2d 312.)

The trial judge in the case at bar acknowledged that the holding in *McTaggart* can in no conceivable manner be interpreted as decreeing that business transactions based on competitive bidding can never lead to a near-permanent relationship, stating:

"Now I certainly agree that *McTaggart* does not stand for the

---

[1] *McTaggart* is an unpublished opinion which, under Rule 35 of the Rules of the United States Court of Appeals for the Seventh Circuit, is not to be cited as precedent. However, an unpublished opinion may, under Rule 35, be cited and discussed when the opinion is relied upon, as it was in *Van Bortel*, for its collateral estoppel effect.

proposition that under no set of circumstances can a protectable interest be had when you are dealing with a public bid situation."

Thus the trial judge based his finding that plaintiffs had no legitimate interest requiring protection on a total rejection of the undisputed record and in favor of the court's own "common ordinary sense" approach to a resolution of the issue. Although the judge conceded that the evidence was "that they spend years and years and years researching and getting to know their clients before they come up with a bid," he dismissed it with the statement, "Why that's the case, I don't know," despite the fact that the evidence as to why that was the case was more than ample and was presented by and through plaintiffs and defendants. And although the judge recognized the relative importance of service, reliability and a relationship of trust over price, he gave it no effect because he saw it as a symptom of a diseased process not within the appropriate cognizance of a court of equity, stating, "But, if in fact, you have a situation where a particular municipal entity chooses to violate the spirit of the competitive bidding statutes and ordinances and all other things being equal awards the contract to the highest bidder for no legitimate reason, I don't know if the court of equity should further that practice by enjoining people from competing," and "Now, if you are talking about all this work of putting yourself in a position to get to know the people who award these contracts, and therefore, be in a better position to receive consideration for things other than being the lowest bidder, again I don't know if the court of equity would enforce." We find such an allusion to impropriety to be without any support in the record; nor does it have any warrant as any sort of inference to be gleaned therefrom.

Illinois courts follow certain well-known criteria in determining whether or not an agreement not to compete involves longstanding customer relationships. These factors include: the amount of money involved in developing a clientele, the difficulty involved in the process of developing the clientele, the extent of client contact necessary for obtaining and retaining a client, the storehouse of intimate knowledge one must accumulate to acquire and maintain a client, and the continuity of the relationship with the client. (*McRand v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 1051-52, 486 N.E.2d 1306, 1311-12.) The *McRand* court found a protectable interest to exist where to obtain a client the plaintiff must identify prospects out of a large number of potential customers, develop in-depth information regarding that potential client's specific needs, expend substan-

tial time and money in promotional programs and proposed plans before securing the client; and provide the defendant employee with access to product information, customer needs, customer buying habits, purchasing requirements, profit margins, pricing analysis and future business plans in connection with servicing clients. *McRand*, 138 Ill. App. 3d at 1052, 486 N.E.2d at 1312.

■ The elements comprising a protectable interest identified in *McRand* are no different in the public sector than they are in the private business world; nor is there any plausible reason as to why they should be. The parties to the case at bar are in agreement that as to competitive bidding, the entity inviting the bids must determine who the *lowest responsible* bidder is.[2] The parties are also in agreement that the lowest responsible bidder need not be the lowest bidder in terms of contract price.

The record in this case shows that plaintiffs were prodigal in clearly establishing a protectable interest under Illinois law; indeed, the record fairly shows that plaintiffs must have taken *McRand* as a guide and proved the ingredients of a protectable interest in their customers accordingly. The undisputed evidence shows that Preferred obtains 70% of its business from only 20 customers, with the Chicago public schools accounting for over 30% of that business. Of some 120 customers, approximately 55 have been Preferred's clients since it began its business in the 1970's and over 85 have been customers for more than five years. Some 70% to 80% of Preferred's customers initially award their food contracts pursuant to competitive bidding, but once Preferred has won a bid and entered into a contract with a public school system, for example, the school district has the option of renewing its contract each year, or to require bidding. Non-bid renewals constitute over 50% of Preferred's annual business, while 20% to 30% of its business for one reason or another is never subject to public bid.

It is uncontested, however, that a sale depends upon more than the bidding process alone. Personal contact with customers is a significant factor in developing and maintaining Preferred's business: sales representatives spend about half of their time servicing existing clients; and in the last four years Preferred has devoted over $1 million per year to servicing existing clients and developing new sales. As stated in an intracompany memo authored by defendant Guse

[2]The parties do not rely on any State statute requiring competitive bidding on public contracts. Rather, their agreement is based on Congress' mandating such bidding in connection with the federally subsidized school lunch program.

while he was still with Preferred:

"Sales to public institutions tend to take a long time before the bid solicitation is released, and a sale consummated. Public administrators work slowly to avoid waste of taxpayers' money and to diminish personal risk in making unsound decisions, about which constituents may frown. The length of a typical school sale can be as long as two years after initial interest is shown by the buyer."

Similarly, Excel's Rose, formerly Preferred's client service manager, testified that to successfully find six customers while at Preferred, he had to make over 100 unsuccessful sales calls. It is also undisputed that additional factors taken into account before a bid is awarded are quality of service, quality of product, past experience, prior performance, student satisfaction, attractiveness, nutritional value, sanitation, and reliable delivery. In fact, in another exhibit authored by Guse he states, "Lowest price isn't always best value. Sometimes lowest price is not value." As a result, contracts are not always awarded to the lowest bidder, as, indeed, was the case when defendant Excel won the contract for the schools of the Catholic Archdiocese of Philadelphia, although its bid was substantially higher than that of the lowest bidder.

Preferred also presented proof that it must search for those comparatively few interested schools among the tens of thousands of school districts that proliferate throughout the United States, and that once a seller establishes a customer relationship, the customer attaches little importance to the fact that the bid of a *trusted* seller is perhaps higher in price. Surely, the existence of Preferred's long-standing customer relationships is forcefully demonstrated by defendants' post-departure conduct of promptly and intensively going about calling on all of Preferred's customers within two to three months, and submitting bids only to Preferred customers during that period—customers, not incidentally, with whom Preferred, doubtless through the efforts of the individual defendants themselves, had established a reputation for service, quality and reliability. In sum, the record is exceedingly clear in this case that the public bid process does not limit public bodies to spending the public's money solely on the basis of a comparison of price, or on what amounts to an auctioning off of their contracts. The relationship between plaintiffs and their customers cannot be considered, in light of the evidence developed in this case, to be transitory or ephemeral. Moreover, none of the authorities holds that the customer relationship in these cases is required to be either perpetual or indissoluble, or both long term and

exclusive to plaintiff (see *Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 893, 480 N.E.2d 1273, 1280); nor does any of them require that a near-permanent relationship be established with each customer.

Accordingly, we find the record to be replete with unrefuted evidence firmly establishing a protectable interest in favor of the plaintiffs and, further, that the trial judge misconstrued the applicable law.

## B

Guse also argues that his employment contract contains a restrictive covenant which is far from the ordinary, having been crafted so that it would not become operative unless he continually went counter to specific directions of the board of directors, and even then, only after written notice of such violations. He contends that there is no evidence that he ever violated any corporate personnel policies or that he was ever put under any warning or was ordered to remediate his conduct as an officer, director or employee of Preferred; consequently, he argues, there was no restrictive covenant to enforce. Guse advanced this theory in the trial court, but the judge held against him.

We need not, however, undertake any consideration of this contention, Guse having failed to cross-appeal from the judge's adverse ruling. *City of Wilmington v. Industrial Comm'n* (1972), 52 Ill. 2d 587, 289 N.E.2d 418; *Cleys v. Village of Palatine* (1980), 89 Ill. App. 3d 630, 411 N.E.2d 1161; *Village of Arlington Heights v. National Bank* (1977), 53 Ill. App. 3d 917, 369 N.E.2d 502.

Consequently, we hold that the circuit court erred in not enjoining Guse from competing with Preferred in those instances where the awarding of contracts is pursuant to competitive bidding.

## II

Plaintiffs argue that the trial court's decision to refuse to enjoin defendants Guse, Reynolds, and Singer from engaging in competition with Preferred was against the manifest weight of the evidence, maintaining that they were entitled to an injunction against all three for having breached the fiduciary duties they owed to Preferred. Plaintiffs argue that Guse was the highest-ranking officer at Preferred, while Reynolds and Singer held two of the next three highest offices, and as such, it is beyond contention that they had an absolute legal obligation to conduct themselves as fiduciaries *vis-a-vis* Preferred. *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill.

App. 3d 285, 291, 379 N.E.2d 765, 769-70.

 Plaintiffs point out that corporate officers are liable for breaching their fiduciary duties where, while still employed by the company, the officer has: (1) failed to inform his employer that other employees were forming a rival company or engaging in other fiduciary breaches (*Unichem Corp. v. Gurtler* (1986), 148 Ill. App. 3d 284, 290, 498 N.E.2d 724, 728, *appeal denied* (1987), 113 Ill. 2d 586, 505 N.E.2d 363); (2) solicited fellow employees to join a rival business (*Unichem*, 148 Ill. App. 3d 284, 498 N.E.2d 724); (3) solicited the business of a single customer before leaving his current employer (*Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 580, 483 N.E.2d 283, 289; *Weis*, 63 Ill. App. 3d at 291, 379 N.E.2d at 770); (4) used the company's facilities or equipment to assist him in developing his new business, or appropriated its money or equipment for that purpose (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 685, 379 N.E.2d 1228, 1237, *appeal denied* (1978), 71 Ill. 2d 616); (5) used the company's confidential business information for the new business, either before or after his departure (*Affiliated Hospital Products, Inc. v. Baldwin* (1978), 57 Ill. App. 3d 800, 806, 373 N.E.2d 1000, 1005); or (6) orchestrated a mass exodus of employees shortly after defendant's resignation from the company (*Unichem*, 148 Ill. App. 3d at 290, 498 N.E.2d at 728; *ABC Trans National*, 62 Ill. App. 3d at 685, 379 N.E.2d at 1237).

The trial court found that there was "no question that Mr. Guse breached the fiduciary duties he had over and over on many occasions in several ways." And at another point in the handing down of his findings and rulings from the bench, the judge stated: "There is no doubt in my mind that the evidence, the breach of fiduciary obligation, is sufficient to warrant injunctive relief." However, the court also remarked that since it was holding that there was no protectable interest in public sector customers justifying the enforcement of his covenant, Guse should not be enjoined for violating his fiduciary obligations. Be that as it may, this is another issue affecting Guse that we need not decide, having held that plaintiffs are entitled to injunctive relief against him based on Guse's breach of his restrictive covenant.

As we have previously noted, the trial court found as to all defendants that plaintiffs satisfied the requirements for a preliminary injunction regarding irreparable injury, the likelihood of success on the merits, and the absence of an adequate remedy at law. As to Guse, as we have already shown, the court felt that the evidence did

not establish Preferred's protectable interest in its public sector customers or its business information. And although the court found that Singer and Reynolds had breached their fiduciary duty at least by not informing Preferred of "Guse's and/or their own activities, I think the harm to the defendant [sic] far outweighs any benefits to the plaintiffs," noting, at the same time, that "I have questions in any case with respect to the protectable interest in the extent to which the injunctive relief could be granted." So, although the court's ruling is not pinpoint clear, it appears that it also concluded as to Singer, Reynolds and Excel that the public bidding process supported the denial of an injunction. In any event, the basis of the court's conclusion that in balancing the equities it should decline to enjoin Singer, Reynolds and Excel was that defendants had succeeded in contracting with only two of Preferred's customers, the Camden public school district and the schools of the Philadelphia Archdiocese, both of which had been with Preferred for over 10 years. The court went on to hold that the balancing test applied also to Excel; relief was consequently denied as to that defendant as well. We note again, however, that the court did find that Preferred had certain customer and costing information that was confidential, which it enjoined all defendants from using or disclosing.

We hold that the trial judge erred in ruling that although the conduct of Singer and Reynolds in not informing Preferred of "Guse's and/or their own activities" constituted a breach of their fiduciary duty, it was insufficient to justify the granting of any further equitable relief to Preferred because the "harm to the defendant [sic] far outweighs any benefits to the plaintiffs." The judge was also in error in holding that Excel, the company organized and principally financed by Guse, should also be exempt from being enjoined, considering that it was the instrumentality employed by all three individual defendants in implementing and perfecting the breach of their duty to Preferred. Indeed, it would be fair to say that Excel is but a refraction of defendants' wrongdoing.

It would constitute the sheerest form of tautology to reiterate here all of the facts that we have catalogued above under the caption "THE EVENTS COMPLAINED OF." For the trial court to characterize Singer's and Reynolds' part therein as merely incidental or peripheral involvement in Guse's scheme to form a rival business is to run impermissibly counter to the plethora of evidence presented by plaintiffs and to the applicable legal precedents.

And to view the harm to these defendants, if they were to be enjoined, as far outweighing any benefit to Preferred is to remain to-

tally oblivious of the brutally glaring fact that the undisputed evidence demonstrates that regardless of who masterminded the plan to create a competing company, Guse would never have been able to establish overnight a formidable and successful competitor without Preferred's major customer contact, Reynolds, or its financial expert, Singer. As a matter of fact, the presence of Reynolds was crucial to the venture's plan of operating as a minority-owned business; indeed, Reynolds was made president of Excel. Moreover, there exists not the slightest bit of evidence that Guse ever gave any thought of organizing a company on his own, without the assistance of Reynolds and Singer.

It is, of course, not essential for all three individual defendants to have acted together at all times. It should surprise no one that Guse did most of the private cajoling of his employees to leave Preferred and that he personally obtained the funds to organize Excel. These facts, however, do not in any way relieve those who acted in concert with him of any responsibility, since each benefitted from the actions of the other. The three needed each other to execute their plan. In fact, the trial judge stated, in ruling on this case, that "he [Guse] obviously needed people to assist him in doing it," and "I am sure he listened to them," referring to the other individual defendants.

We are accordingly constrained to hold that the trial court abused its discretion in applying the equitable doctrine of balancing the equities and conveniences between the parties in denying to plaintiffs the injunctive relief they sought as to Singer and Reynolds, for it is well established in Illinois that the doctrine is inapplicable where a defendant's actions are done with full knowledge of the plaintiff's rights and with an understanding of the consequences which might ensue. (*Gold v. Ziff Communications Co.* (1989), 196 Ill. App. 3d 425; *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 682-83, 379 N.E.2d 1228, 1236, *appeal denied* (1978), 71 Ill. 2d 616.) The trial judge in the case at bar, in holding that Singer and Reynolds breached their fiduciary duty to plaintiffs by not informing them of "Guse's and/or their own activities," recognized what those activities were and recognized also that both their carrying on of such actions and their refusal to inform their employer thereof were done with full knowledge of the plaintiffs' rights and with an understanding of the consequences which might ensue. Moreover, injunctive relief against the three individual defendants without restraining the creature spawned by their wrongs would be completely without any force or effect; Ex-

cel, therefore, is also to be enjoined. Accordingly, having reversed the circuit court as to plaintiffs' case against Guse, we reverse its judgment as to Singer, Reynolds and Excel as well. On remand the circuit court should consider the effect that the passage of time may have had upon the parties' interests since the initial violation of Guse's agreement and Singer's and Reynold's breach of fiduciary duty, having due regard for the period of time the TRO was in effect and the elements referred to in *Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435.

This cause is reversed and remanded for further proceedings consistent herewith.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.