WILLIAM L. APPELBAUM, Indiv. and as Trustee of the William L. Appelbaum Revocable Trust dated July 19, 2000, Plaintiff, v. JONATHAN D. APPELBAUM et al., Defendants (Penguin Frozen Foods, Inc., Defendant and Counterplaintiff-Appellee; William L. Appelbaum, Plaintiff and Counter-defendant-Appellant; John W. Appelbaum, Individually and as a Third-Party, Third-Party Defendant-Appellant).

First District (2nd Division)   No. 1—04—2627

Opinion filed February 1, 2005.

928

Richard G. Schultz and Patrick T. Stanton, both of Schwartz, Cooper, Greenberger & Krauss, Chtrd., of Chicago, for appellant John W. Appelbaum.

William I. Goldberg and Molly M. Joyce, both of Seyfarth Shaw, L.L.P., of Chicago, for appellant William L. Appelbaum.

Michael W. Coffield and Sandra J. McMullan, both of Michael W. Coffield

& Associates, and Kevin M. Flynn, of Kevin M. Flynn & Associates, both of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

This is the second case we have been asked to decide regarding members of the Appelbaum family and their disputes over the family's frozen shrimp business, Penguin Frozen Foods, Incorporated (Penguin Foods). Our decision in this case is confined to the preliminary injunction entered in the trial court.

It all started when William Appelbaum (William) filed a complaint against his siblings and other members of Penguin Foods' board of directors, alleging several causes of action arising from the termination of his employment. See *Appelbaum v. Appelbaum*, No. 1—03—0221 (2003) (unpublished order under Supreme Court Rule 23). Penguin Foods filed a countercomplaint against William and John W. Appelbaum (J.W.) alleging breach of contract and tortious interference with a contract. The contract at issue is a restrictive covenant signed by J.W. when he worked for Penguin Foods.

In this interlocutory appeal, counterdefendants William and J.W. contend the trial court improperly granted counterplaintiff Penguin Foods a preliminary injunction, enjoining them from contacting several of Penguin Foods' customers and suppliers based on the restrictive covenant J.W. signed. We conclude the preliminary injunction is too broad and must be substantially modified.

FACTS

Penguin Foods, a Delaware corporation, is owned and operated by Jonathan, Daniel, and Andrea Appelbaum in Northbrook, Illinois. William Appelbaum is their brother. Since 1950, Penguin Foods has been buying and selling seafood products, primarily domestic frozen shrimp harvested from the Gulf of Mexico. Penguin Foods purchases almost all of its shrimp inventory between May and December of each year, the high season for catching shrimp in the Gulf of Mexico. Penguin Foods stores the frozen shrimp and uses it to fill sales orders throughout the year.

In September 2001, Jonathan terminated William's employment with Penguin Foods. William is now vice-president and secretary of Worldwide Shrimp (Worldwide). Like Penguin Foods, Worldwide buys and sells domestic shrimp from the Gulf of Mexico.

J.W. is William's cousin and worked as a salesman at Penguin Foods for 18 years, beginning in 1986. On May 22, 1991, J.W. signed a restrictive postemployment covenant (the Covenant) with Penguin Foods. The Covenant included a nonsolicitation clause:

"Employee covenants and agrees that, for a period of [24 months] following the termination of Employee's employment with the Company for any reason, Employee shall not, as principal, agent, owner, partner, stockholder, officer, director or participant, independent contractor, or employee (either with or without compensation) or in any individual or representative capacity whatsoever, directly or indirectly, contact, call upon, purchase from, solicit business from, sell, or buy, or contract to sell to or buy from, any Customer or Supplier of the Company any Product which is the same as or similar to any Product bought or sold by the Company, and Employee shall not, directly or indirectly, aid or assist any other person, firm or corporation in doing any of the aforesaid acts."

The Covenant defined "Customer":

"those customers of [Penguin Foods]

(1) that Employee contacted or serviced during the [12] month period immediately preceding the termination of Employee's employment, and

(2) that contracted with [Penguin Foods] for the purchase of Products or to whom [Penguin Foods] sold Products during the [12] month period immediately preceding the termination of Employee's employment."

According to the Covenant's definition, "suppliers" were those that J.W. "contacted or dealt with *** and that contracted with the company to sell and deliver Product to [Penguin Foods] during the [12] month period immediately preceding the termination of [J.W.'s] employment."

While at Penguin Foods, J.W. was the top salesman, bringing in 40% to 50% of its sales. His duties included servicing accounts: managing shipping, controlling inventory, negotiating prices, and approving credit for customers. In return, Penguin Foods paid J.W. over $7 million in salary and bonuses from 1991 to 2003.

J.W. left Penguin Foods in January 2004 and formed Worldwide with William a few months later. J.W. serves as the president and treasurer of Worldwide. J.W., William, and William's two children are Worldwide's shareholders.

On May 5, 2004, Penguin Foods filed a third-party complaint against J.W., alleging he breached the Covenant. Penguin Foods also amended its counterclaim against William, adding a claim of tortious interference for inducing J.W. to breach the Covenant and moved for a temporary restraining order and preliminary injunction. Penguin Foods submitted a list of its 48 suppliers (Exhibit 24) and 494 customers (Exhibit 25). In Exhibit 24, Jonathan wrote "PC" or "SC" by the suppliers' names if J.W. was their primary or secondary contact. In

Exhibit 25, Jonathan wrote "PC," "SC," or "S" next to some of the names to indicate J.W. was their primary or secondary contact or had serviced those customers. Jonathan also noted which customers had been ordering from Penguin Foods for approximately 3, 5, 10, or over 20 years. Penguin Foods requested the court enjoin J.W. and William from contacting those customers and suppliers for the duration of the 24-month period required by the Covenant. There was no attempt to file the customer and supplier lists under seal.

At the hearing on Penguin Foods' motion, J.W. testified that after leaving Penguin Foods he had not contacted any of the customers on Penguin Foods' list and had told several of his former customers he could not sell to them due to the Covenant. When asked to review Jonathan's notations in Exhibit 25, J.W. agreed he was the primary contact for all but one of the "PC" customers. He agreed he had contact with all of the "SC" customers, but denied any contact with the customers with an "S" appearing next to their names. J.W. denied he was the secondary contact for the "SC" suppliers as noted in Exhibit 24.

J.W. testified Worldwide had three employees: William, J.W., and Mr. Zibinski, who helped with the computers. J.W. said he did not assist William in contacting Penguin Foods' customers or suppliers. William would go to a separate office when communicating with customers he and J.W. believed were covered by the Covenant. If J.W.'s former customers contacted him, J.W. told them he could not sell to them due to the Covenant. J.W. admitted he still was able to make a living in the seafood industry despite the covenant's limitations.

William testified J.W. gave him permission to use his name in Worldwide's business plan before J.W. left Penguin. If suppliers asked, William told them J.W. was his partner at Worldwide. William admitted that during his 20 years at Penguin Foods, he purchased from only one supplier and could not remember the supplier's name. He agreed he was responsible for only 1% of Penguin Foods' sales.

Jonathan testified Penguin Foods required key employees of the company to sign postemployment covenants. Jonathan's siblings, brother-in-law, and J.W. all signed covenants. Jonathan explained his family members were required to sign covenants because the family name carried "a great amount of significance" in the "small industry." Sales personnel who were not members of the Appelbaum family were not required to sign the covenant.

Jonathan testified he considered "servicing" customers to include functions that were unique to individual customers and their needs, such as the size, type, and color of shrimp they preferred. Typically, customers who placed orders with Penguin Foods would specify only

the shrimp size they wanted. Based on J.W.'s experience and training, J.W. then would select which type of shrimp to send the client, as well as the location of the inventory. J.W. serviced customer orders by choosing which shrimp to ship even when the order was placed with another salesperson. In addition to sales, J.W. was primarily responsible for shipping, and he purchased all of Penguin Foods' peeled shrimp inventory. J.W. and Jonathan were the only two Penguin Foods' employees who could extend credit to customers for their orders.

Jonathan testified that Worldwide's conduct "created a great amount of uncertainty, both with suppliers and customers, as to Penguin's ongoing viability." He was aware of "a dozen or so" of Penguin's customers contacted by Worldwide—some had been Penguin's customers for over 10 years. Those customers accounted for 12% of Penguin Foods' sales in 2003. Due to customers' changing needs, Jonathan could not determine Penguin Foods' lost profits based on historical data.

In addition to the testimony of the three witnesses, the parties submitted several exhibits to the trial court.

The trial court granted Penguin Foods' motion for a preliminary injunction and enjoined J.W. and William from contacting 29 of Penguin Foods' suppliers and 233 of the 262 customers who purchased from Penguin in 2003.

J.W. and William filed this interlocutory appeal, contending the injunction represents an abuse of discretion.

DECISION

First, we must sort out the issues that have to be decided. J.W. and William do not contend the Covenant, on its face, violates established legal principles. They have no quarrel with the terms of the Covenant. J.W.'s position is that Penguin Foods failed to prove he did anything that violates the Covenant. In his brief, J.W. says he "does not dispute that regardless of his status, *he* cannot contact, directly or indirectly, his 2003 customers and suppliers." (Emphasis in original.) That leaves us with J.W.'s claim that he cannot be enjoined from contacting customers he merely serviced but did not contact during 2003, and his claim that he cannot be enjoined from contacting suppliers other than those Penguin listed as suppliers who used J.W. as their primary contact at Penguin (the "PC" suppliers). William, relying on his claim that he operates within a "Chinese Wall," contends any restriction the Covenant imposes on J.W. does not apply to him.

I. Standard of Review

■ The purpose of a preliminary injunction is to preserve the

status quo until the trial court decides the merits of a case. *Dixon Ass'n for Retarded Citizens v. Thompson,* 91 Ill. 2d 518, 524, 440 N.E.2d 117 (1982). A trial court's decision to grant a preliminary injunction will not be set aside unless we find the trial court abused its discretion. *Millard Maintenance Service Co. v. Bernero,* 207 Ill. App. 3d 736, 743-44, 566 N.E.2d 379 (1990). As a reviewing court, our role is limited to determining whether the trial court's findings were against the manifest weight of the evidence. *Millard Maintenance,* 207 Ill. App. 3d at 744; *McRand, Inc. v. Beelen,* 138 Ill. App. 3d 1045, 1050-51, 486 N.E.2d 1306 (1985). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Arthur H.,* 212 Ill. 2d 441, 464, 819 N.E.2d 734 (2004).

II. Protectible Business Interest Required for a Preliminary Injunction to Enforce a Restrictive Covenant

■ "[T]he enforceability of a restrictive covenant is a question of law which must be carefully scrutinized because such covenants operate as a partial restraint on trade." *Lyle R. Jager Agency, Inc. v. Steward,* 253 Ill. App. 3d 631, 636, 625 N.E.2d 397 (1993). The party relying on the covenant must show it is reasonable and necessary to protect a legitimate business interest, in addition to the usual elements of a valid agreement, like consideration. *Office Mates 5, North Shore, Inc. v. Hazen,* 234 Ill. App. 3d 557, 568, 599 N.E.2d 1072 (1992). J.W. and William do not claim the restrictive covenant in this case is unenforceable.

A party seeking a preliminary injunction to enforce a restrictive covenant must show: (1) it has a protectible interest, such as near-permanent customer relationships or confidential information; (2) no adequate remedy at law exists; (3) the party will suffer irreparable harm if the injunction is not granted; and (4) there is a likelihood the party will succeed on the merits. *Lyle R. Jager Agency,* 253 Ill. App. 3d at 635.

William and J.W. contend Penguin Foods is not entitled to a preliminary injunction barring their contact with the "serviced" customers or the "SC" suppliers because Penguin Foods failed to show: (1) J.W. "serviced" those customers; (2) J.W. had access to confidential information as a Penguin Foods employee; or (3) it had near-permanent relationships with those customers and suppliers. William and J.W. also contend the trial court abused its discretion by extending the preliminary injunction to cover William.

First, Penguin Foods is right when it says J.W. "serviced" several of its customers by handling the shipping, choosing the product, extending credit, and managing the inventory. But that does not decide

the issue. We still must find a protectible business interest. Without it, the covenant cannot be enforced. See *Lyle R. Jager Agency*, 253 Ill. App. 3d at 635.

■ There are two ways a party can establish that it has a protectible business interest: (1) it can show the employee acquired the party's confidential information and attempted to use that information for his own benefit; or (2) it can show it has a near-permanent relationship with its customers, and but for his employment with the party, the employee would not have had access to those customers. *Office Mates 5*, 234 Ill. App. 3d at 569.

The trial court found both circumstances existed in this case.

A. Penguin Foods' Protectible Business Interest—Confidential Customer Information

William and J.W. contend the servicing information and knowledge J.W. acquired was not confidential and does not qualify as a protectible business interest. Penguin Foods concedes it cannot protect its customers' names, but instead seeks to prevent J.W. from using information he learned about each customer's shrimp preferences.

Penguin Foods makes no serious claim that its servicing information—credit approval, product choice, packing plant selection, freight arrangements, and size and color of shrimp—is the kind of confidential information that is protectible by injunction. Confidentiality was not claimed by Penguin Foods during oral arguments in this appeal. Nowhere in the Covenant do we find a reference to "confidential" information. Instead, the Covenant repeatedly refers to "near-permanent" relationships with Penguin Foods' customers and their special needs. We address the issue because the trial court found confidential information.

In *Office Mates 5*, the court described which types of customer information are protectible. Customer information cannot be protected if it is generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories. *Office Mates 5*, 234 Ill. App. 3d at 575.

In this case, Jonathan testified that J.W. had special knowledge regarding the shipping and product needs of Penguin Foods' customers. Penguin Foods stated in its brief, "This information is *only* obtained through servicing the customer." (Emphasis added.) Yet there is no indication Penguin Foods' competitors have not compiled similar information or could not easily acquire that information simply by asking customers when they place their orders. See *Office Mates 5*, 234 Ill. App. 3d at 575-76 (when customer information is readily available to competitors through normal competitive means, such as asking

questions designed to elicit the information, the information is not protectible).

Other Penguin Foods' salesmen, non-Appelbaum, also had access to such information, yet Penguin Foods did not require every salesman to sign a restrictive covenant or confidentiality agreement. In addition, information used to "service" customers when extending credit is available from Seafax—a seafood industry directory and credit reporting agency.

■ Based on the evidence presented at the hearing, we conclude J.W.'s knowledge of Penguin Foods' customers—their preferences and credit information—is not confidential. Penguin Foods did not present evidence suggesting it disclosed confidential information to J.W. or that the type of knowledge J.W. had was unique in the industry. The opposite conclusion is clearly evident.

B. Penguin Foods' Near-Permanent Relationships

William and J.W. contend Penguin Foods has no protectible business interest in its suppliers, other than those for which J.W. was the primary Penguin contact in 2003. Additionally, they contend Penguin Foods did not have near-permanent relationships with the 189 customers it alleged J.W. serviced but did not contact in 2003.

■ Illinois courts have used two tests to determine whether a business has near-permanent relationships. Using the first test, the courts examine the nature of the plaintiff's business. *Office Mates 5*, 234 Ill. App. 3d at 571. The second test involves the application of seven factors. *McRand*, 138 Ill. App. 3d at 1051-54.

Under the first test—the "nature of the business" test—certain businesses are more successful in showing near-permanent relationships, such as businesses engaged in providing professional services or selling unique products. *Office Mates 5*, 234 Ill. App. 3d at 571. "[A] near-permanent relationship with customers is generally absent from businesses engaged in sales." *Springfield Rare Coin Galleries, Inc. v. Mileham*, 250 Ill. App. 3d 922, 935, 620 N.E.2d 479 (1993). "When the employer's business is sales of a nonunique product, its customers also do business with its competitors, are generally known to the competitors, or are ascertainable by reference to telephone or specialized directories, the near-permanency test will not be satisfied." *Springfield Rare Coin Galleries*, 250 Ill. App. 3d at 936; see *Office Mates 5*, 234 Ill. App. 3d at 571; *Image Supplies, Inc. v. Hilmert*, 71 Ill. App. 3d 710, 714-15, 390 N.E.2d 68 (1979).

Using the second test, courts apply seven factors to determine whether a near-permanent relationship exists: (1) the number of years it takes the employer to develop its clientele; (2) the money it invested

to acquire its customers; (3) the difficulty it faced when acquiring customers; (4) the extent of the employee's personal contact with the customer; (5) the employee's knowledge of the customers; (6) the length of time the customers have been associated with the employer; and (7) the continuity of the customer relationships. *McRand*, 138 Ill. App. 3d at 1051-54.

1. *Penguin Foods' relationships with its suppliers*

■ Confining our inquiry to those suppliers listed by Penguin as "SC," we find Penguin Foods failed to prove the existence of near-permanent relationships. J.W. concedes he is prohibited from contacting or doing business with suppliers he contacted in 2003, and he admitted contact with those suppliers listed as "PC"—primary contacts. We include the secondary contact suppliers in our inquiry because we agree with J.W. that there is little or no evidence he actually contacted them in 2003. He denies it, and Jonathan's testimony about those contacts lacks any assuredness.

The record provides no evidence indicating Penguin Foods had any difficulty in creating relationships with those suppliers or the time required to find new suppliers or whether it spent specific amounts of money to secure new suppliers. Unlike the customer list, Penguin Foods' suppliers list does not show how long Penguin Foods has been using the listed suppliers. Names of the suppliers are easy to find. They do not sell a unique product; nor do they use any secret process, design, or plan.

Penguin contends J.W. has "expansive" knowledge of Penguin Foods' suppliers, but does not articulate how that knowledge strengthened the relationships between Penguin Foods and its suppliers or how it gives him a competitive advantage. Penguin Foods' allegations that it invested time, money, and effort in securing its suppliers are unsupported by evidence. Nor is there any evidence to establish the duration or continuity of those relationships.

The only case Penguin Foods cites to support the injunction's application to suppliers, *J.D. Marshall International, Inc. v. Fradkin*, 87 Ill. App. 3d 118, 409 N.E.2d 4 (1980), does not control. The issue in that case was whether the trial court properly dismissed plaintiff's claim of breach of a restrictive covenant. On appeal, the court reversed the dismissal, finding the plaintiff's complaint, liberally construed, set forth a legitimate business interest, because the plaintiff claimed it had an exclusive agreement with at least one of its suppliers. *J.D. Marshall*, 87 Ill. App. 3d at 123.

Here, Penguin Foods presents no evidence of an exclusive relationship with its "SC" suppliers to support its plea for injunctive relief.

Without evidence of exclusive supplier relationships or any of the *McRand* factors concerning the "SC" suppliers, we conclude the trial court's finding that Penguin Foods had near-permanent relationships with those suppliers was against the manifest weight of the evidence.

*2. Penguin Foods' relationships with its customers*

■ Next, we decide whether Penguin Foods had near-permanent relationships with those 189 customers J.W. serviced in 2003 but with whom he had no actual contact. We understand Penguin Foods to be contending those near-permanent relationships somehow formed a protective bond for the servicing information.

Penguin Foods sells shrimp, a non-unique product. At oral argument, Penguin Foods contended its business is not merely selling shrimp but providing a service to its customers. J.W. provided that service by approving customers for credit, knowing their product preferences, and arranging for the shrimp to be shipped to the customers. Penguin Foods contends this service gives it a protectible business interest in those customers. We disagree.

Any service Penguin Foods provides its customers, in the form of credit approval, shipping arrangements, or specifying what type of shrimp to send, is ancillary to its sales. Penguin Foods, a shrimp wholesaler, cannot be described as a service provider simply because it provides basic customer service when selling its product. It uses no secret plans, design, or process. Its product is not special or unique. There is nothing very complicated about shrimp. Penguin Foods business is not the type that can easily show near-permanent relationships. See *Office Mates 5*, 234 Ill. App. 3d at 571-72.

We reach the same conclusion when we use the seven *McRand* factors. The first factor—the length of time customers have been associated with the employer—indicates near-permanent relationships when the relationships last a long time and are uninterrupted. Compare *Preferred Meal Systems, Inc. v. Guse*, 199 Ill. App. 3d 710, 722, 557 N.E.2d 506 (1990) (factor helped plaintiff where it had 10-year-old relationships with half of its customers and over two-thirds of plaintiff's customers had been clients for over 5 years), with *Office Mates 5*, 234 Ill. App. 3d at 573 (factor weighed against the plaintiff because 50% of its customers never returned and two-thirds of its customer relationships were less than five years old).

Penguin Foods has been around for 54 years. Its customer list shows 89 customers have purchased seafood from Penguin Foods for over 10 years. Another 104 customers have been buying from Penguin for over 3 years. Together, these customers make up 39% of the 494 accounts listed.

Although these customers have been purchasing seafood from Penguin for a long time, they account for a relatively small percentage of the total list. Jonathan admitted in a deposition that there was a lot of fluidity in the customer lists, and Penguin typically gained and lost 10 to 15 customers each year. The record does not provide evidence of the specific time it took and the cost to develop individual customers.

In *McRand*, the court found this first factor favored the employer because the defendant employees held key positions within the company and had intimate knowledge of the customers' needs, buying habits, future plans, and previously rejected or accepted proposals. That knowledge allowed them to offer a full range of services to their customers. *McRand*, 138 Ill. App. 3d at 1052-53. The court said, "Employees' extensive and specific knowledge of customers is unnecessary in a business where the customers are transitory." *McRand*, 138 Ill. App. 3d at 1053. In *McRand*, relied on heavily by Penguin Foods, a protectible business interest was found. But McRand had only five major accounts. The business involved maintaining longstanding customers in designing and coordinating management incentive award programs for major corporations or businesses. The defendant employees had formed a competing business and solicited McRand customers 18 months before resigning. Personal contact with customers was the controlling fact in *McRand*: "The extent of McRand's knowledge of its clients is closely related to the factor of personal customer contact by its employees." *McRand*, 138 Ill. App. 3d at 1052.

In this case, J.W. made decisions as to which shrimp would be used to fill customer orders. Unlike the employees in *McRand*, J.W. did not need an extensive and specific knowledge of Penguin Foods' customers to do this job. The only customer-related information he needed to know for the task was which color or size shrimp the customer preferred. He then relied on his knowledge of Penguin Foods' inventory, its location, and shipping resources to decide which shrimp to send. Simply knowing which shrimp a customer likes is not the type of extensive knowledge that indicates a near-permanent relationship.

Next, we examine the extent of J.W.'s contact with Penguin's customers. Substantial contact between an employee and a customer indicates the employer was pursuing a near-permanent relationship. *McRand*, 138 Ill. App. 3d at 1052; see *Millard Maintenance*, 207 Ill. App. 3d at 748 (employer and sales staff made an effort to develop and maintain close relationships with customers, including social outings with key people working for customers).

J.W. contends Penguin Foods must establish J.W. had contact with a large percentage of Penguin's customers to justify an injunction

against J.W. from soliciting the 189 "serviced" customers he did not contact. In *McRand*, 138 Ill. App. 3d at 1058, the court said, "The trial court may properly enjoin only activities involving the employer's customers with whom the former employees had been involved during their employment."

Here, J.W. worked for Penguin Foods for 18 years and served as a primary or secondary contact for several customers. For the 189 "serviced" customers at the center of this dispute, he fulfilled a "behind-the-scenes" administrative role by deciding which inventory to ship them and whether to extend them credit. As J.W. adamantly maintains, the record reflects he had no direct contact with those customers he only serviced. We do not believe the contact factor indicates the existence of near-permanent relationships with respect to the "serviced" customers in this case.

There is little information about Penguin Foods' customers available for us to apply the remaining *McRand* factors. The record bears no evidence of the frequency of its customers' contact or orders with Penguin, or whether they used other suppliers in addition to Penguin. Penguin Foods failed to produce any evidence showing it was time-consuming, expensive, or difficult for Penguin to acquire new customers. Although Penguin Foods alleged in its complaint that it spent over $100,000 to develop J.W. and other salesmen, J.W. denied that allegation as it applied to him. A refuted allegation is not considered evidence. See *Ableman v. Slader*, 80 Ill. App. 3d 94, 99, 224 N.E.2d 569 (1967) ("'[a] temporary injunction should not be granted on the pleadings alone where the answer controverts material allegations of the complaint"); see also *Office Mates 5*, 234 Ill. App. 3d at 574 (no near-permanent relationships found where money spent to train account executives was not directly tied to a particular client; taking clients out for lunch and sending cards and gifts was not sufficient).

We believe Penguin Foods failed to present enough evidence showing it had near-permanent relationships with the serviced-only customers. The trial court's finding of near-permanent relationships with those customers was against the manifest weight of the evidence.

3. *Remaining requirements for a preliminary injunction*

■ In addition to showing a protectible business interest, a party seeking a preliminary injunction must present a fair question that the claimed rights exist and it will probably be entitled to the relief sought. *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163, 174, 773 N.E.2d 1155 (2002). The party must also show there is no adequate remedy at law and it will suffer irreparable harm absent the injunction. *Lyle R. Jager Agency*, 253 Ill. App. 3d at 635.

In this case, the trial court found that Penguin Foods satisfied the requirements for a preliminary injunction regarding the likelihood of success on the merits, the absence of an adequate remedy at law, and irreparable harm. For purposes of this appeal, we have determined these findings were not against the manifest weight of the evidence. We have confined our analysis to the preliminary injunction dispute; we do not intend to decide the issues raised by Penguin Foods' counterclaim for money damages.

*4. Scope of the preliminary injunction—Enjoining William*

We must also decide whether the trial court properly enjoined William from soliciting any of Penguin Foods' customers that J.W. could not solicit, even though William was not a party to the Covenant.

In *Preferred Meal Systems*, 199 Ill. App. 3d at 713, the plaintiff appealed the trial court's denial of preliminary injunctive relief against three former employees—Guse, Singer, and Reynolds. The plaintiff alleged Guse breached his restrictive postemployment covenant when he formed a competing business with Singer and Reynolds, and that all three defendants breached their fiduciary duties to their former employer by hiring away its employees. *Preferred Meal Systems*, 199 Ill. App. 3d at 714-15. On appeal, this court said the company formed by the defendants should have been enjoined as "the instrumentality employed by all three individual defendants in implementing and perfecting the breach of their duty to [the plaintiff]." *Preferred Meal Systems*, 199 Ill. App. 3d at 726. The court ordered the trial court to grant injunctive relief against all three individual defendants and their new business, explaining, "injunctive relief against the [defendants] without restraining the creature spawned by their wrongs would be completely without any force or effect." *Preferred Meal Systems*, 199 Ill. App. 3d at 727.

William and J.W. contend they implemented a "Chinese Wall" to prevent J.W. from assisting William to solicit the customers and suppliers J.W. could not directly solicit. The trial court found that William and J.W.'s "Chinese Wall" was inadequate to protect Penguin Foods' interests.

The term "Chinese Wall" describes a strategy used by organizations to prevent the flow of confidential information from one person to another. See *Weglarz v. Bruck*, 128 Ill. App. 3d 1, 6, 470 N.E.2d 21 (1984) (law firm established "Chinese Wall" to prevent an attorney from sharing a previous client's confidential information with attorneys representing adverse clients). "Chinese Walls" are frequently used in law firms to prevent being disqualified from representing a client based on an attorney's conflict of interest. *Weglarz*, 128 Ill. App.

3d at 4. In *Weglarz*, a law firm tried to prevent disqualification by arguing it had a "Chinese Wall" in place to insulate the attorneys involved in the litigation from the conflicted attorney. The trial court ruled against the firm and disqualified it. On appeal, this court affirmed, noting this was a small law firm "where presumably there is more contact between the attorneys than would exist in a large, departmentalized firm." *Weglarz*, 128 Ill. App. 3d at 6.

■ In this case, several facts support the trial court's decision, such as the small size of Worldwide, J.W.'s position in the company, and the likelihood of contact between J.W. and William. J.W. played several important roles at Worldwide as its president, treasurer, and half of its sales team at the time Penguin Foods moved for a preliminary injunction. Worldwide's small size makes it unlikely J.W. and William can manage the business without sharing information about its clientele. J.W. and William run Worldwide. Due to their positions in the company, they lack any mechanism to enforce the "Chinese Wall," such as a person with more authority to ensure they do not share information about J.W.'s former customers.

Additionally, the trial court could infer J.W. receives financial benefit from any sales William secures from Penguin Foods' customers. Worldwide is a closely held corporation. Worldwide's only other shareholders, besides J.W. and William, are William's two children.

Although William says he retreats to a separate office when talking to Penguin Foods' customers, the trial court could infer contact between J.W. and William is very likely. See *Weglarz*, 128 Ill. App. 3d at 6. The trial court could reasonably infer William invited J.W. to join Worldwide because he needed J.W.'s knowledge and expertise. When J.W. left Penguin Foods, he was its top salesman, bringing in 40% to 50% of its annual sales, and he purchased all of Penguin Foods' peeled shrimp inventory. In comparison, William brought in only 1% of the company's sales, and his purchasing experience was limited to transactions with one supplier whose name he had forgotten.

Based on these facts, we conclude the trial court's finding that Worldwide's "Chinese Wall" did not protect William from being enjoined was not against the manifest weight of the evidence.

CONCLUSION

For the reasons we have given, we remand this cause to the trial court to redraw the temporary injunction. We direct the trial court to do as follows:

(1) enjoin J.W. from soliciting or selling to the Penguin Foods customers for which J.W. was the primary or secondary contact, listed as "PC" or "SC" on Penguin Exhibit 25;

(2) enjoin William from soliciting or selling to those Penguin Foods customers for which J.W. was the primary or secondary contact in 2003, listed as "PC" and "SC" on Penguin Exhibit 25;

(3) enjoin J.W. from contacting or buying from those suppliers for which J.W. was the primary contact, listed as "PC" on Penguin Exhibit 24;

(4) enjoin William from contacting or buying from those suppliers for which J.W. was the primary contact, listed as "PC" on Penguin Exhibit 24; and

(5) eliminate from the preliminary injunction all other provisions that purport to enjoin J.W. and William from soliciting, contacting, buying from, or selling to Penguin suppliers and customers.

Reversed; cause remanded with directions.

HALL and GARCIA, JJ., concur.