CULLEN ELECTRIC COMPANY, Plaintiff-Appellant, v. WILLIAM J. CULLEN, JR., *et al.*, Indiv. and d/b/a Cullen Electrical Contracting Company, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—0562

Opinion filed August 16, 1991.

Groble & Groble, Ltd., of Chicago (Donald G. Groble, Terence E. Coughlan, and George W. Groble, of counsel), for appellant.

Richard J. Troy, of Chicago (William G. Hutul and Peter J. Troy, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Cullen Electric Company, filed a petition for preliminary injunction on September 17, 1990, against defendants, William J. Cullen, Jr. (William), Sharon Cullen, his wife, and Cullen Electrical Contracting Company (defendant), seeking to enjoin defendants from contacting or performing work for plaintiff's customers; from interfering with plaintiff's relationships with its customers; and from using the name "Cullen" in defendant's electrical contracting business. After hearing more than 15 witnesses testify over 13 days, the circuit court granted that portion of plaintiff's motion which restrained defendant's use of plaintiff's records and bids or estimates developed by any person while in plaintiff's employ. In this interlocutory appeal pursuant to Supreme Court Rule 307(a) (134 Ill. 2d R. 307(a)), plaintiff appeals from those portions of the order which denied plaintiff's request to enjoin defendants from contracting or doing business with plaintiff's former or current customers, and from using the name "Cullen" in their business name.

Plaintiff was established in the early 1960's. Prior to June 1, 1990, defendant William had served as president and member of the board of directors for more than five years, after succeeding to the office upon his father's death. William's father, William Cullen, Sr., Thomas Maloney and Joseph Mahoney were the original shareholders and incorporators of the company. George Cullen, an attorney, also sat on the board of directors. As of June 1, 1990, Maloney, plaintiff's vice-president, and Mahoney each owned 37½% of plaintiff's stock while William owned 25% of the stock. No covenant not to compete existed between William and plaintiff.

Prior to June 1990, plaintiff also employed Michael Simon, general superintendent, for 14 years, who worked closely with 12 regular customers; Joseph Ryan, an estimator, for 13 years; Timothy Harvey, an estimator; Michael Marchese, a foreman/electrician; Maureen Bufano, an office worker; Timothy Gallagher and Joseph Harvey, truck drivers; and O.R. Graf, an electrician.

Before June 1990, plaintiff had established long-term relationships with many of its customers, including the following: the White Sox

for 27 years (1989 gross receipts from this account totalling more than $335,000); Floyd M. Philips Realty since the early 1960's; Richmond Development Corporation for 15 years; Chicago Building Maintenance Company for 15 to 18 years (gross receipts of about $335,000 between October 1989 and April 1990); Calumet Federal and Gannett Outdoor of Chicago as regular customers for three to four years (1988 Gannett billings exceeding $133,000); and Capitol Development Corporation for 15 years (1989 gross sales receipts totalling $506,278).

The record reveals the following occurrences in June 1990.

On about June 10, 1990, William discussed setting up a separate minority-type corporation that would bid on contracts, then subcontract the jobs to plaintiff. The shares of Cullen Trucking Company, a subsidiary of plaintiff, were assigned to Sharon Cullen, William's wife, to effectuate this purpose. The subsidiary's name was changed to Cullen Electrical Contracting Company, and was approved by the Secretary of State on June 25, 1990. William testified that he chose the site for his new office on June 19 or 20 and ordered phone service on June 20. According to George Cullen, William informed him on June 20 that he was forming a new company to compete with plaintiff.

William testified that on June 19 he told Mahoney that he intended to leave the company. William told Mahoney that he had brought the company from $700,000 to $1,200,000 and would not continue to make it grow to the point where he could not buy out Mahoney. Mahoney testified that this conversation took place on June 14.

On June 19, William wrote a check for $1,064 from plaintiff's account for office supplies, not purchased for plaintiff's operations. William wrote several checks around June 22 in the amounts of $18,930, $2,464 and $6,265 for tools and supplies. On June 19, Sharon issued herself a check for $1,037.60 representing 40 hours of work at $25.94 per hour for the period ending June 10. Fran Gutierrez, plaintiff's office manager, testified that Sharon worked "two, maybe three [days], tops" per week during this month; Maloney testified that Sharon worked one day per week at the most, for about six hours. William issued severance slips on June 21 for O.R. Graf and on June 22, for Simon and several other employees. Simon received a $3,000 bonus check and regular paycheck, although he had never before received a bonus in his 14-year employment with plaintiff. Simon continued after June 22 to use plaintiff's car phone to contact at least six current customers of defendant company. He also telephoned William 21 times that week from the car phone. On June 23, William and Sharon opened a business checking account for defendant company. Sharon typed a proposal letter, dated June 24, on defendant's stationery to

Capitol Construction for the Brooks Brothers/Rookery building job. She did not recall whether William dictated and signed the letter on June 25 or 26.

William testified that "sometime after the 17th [of June]," he first told Don Esposito, White Sox operations manager, about his intention to form his own company in what William characterized as a "very quick passing conversation." According to William, Esposito responded, "When you do it, give me a call, maybe we can get something together." The record reveals that William made numerous telephone calls from his car phone to the White Sox on June 19 and 20, although William did not know to what they related. William testified that he went to Esposito's office on June 27 to discuss his new company taking over the White Sox electrical maintenance work. In July 1990, Esposito informed plaintiff that it could not bid on the new White Sox scoreboard. This $351,000 contract was subsequently awarded to defendant in August 1990.

A memo dated June 25, from Esposito to White Sox employees, stated:

> "Because of circumstances beyond our control we have contracted to use a new electrical contractor. Joe Mahoney, who spent 30 years with the Chicago White Sox in the capacity of head electrician will be leaving us to pursue other avenues with Cullen Electric. *** Ron Graf will be our new electrician here effective June 29, 1990, here at Comisky Park. Please welcome Ron to the White Sox family with open arms ***."

Richard Devine of Capitol Construction Company testified that he informed William on June 25 that plaintiff's bid on the Brooks Brothers job was inadequate. William subsequently told Devine that he was leaving plaintiff company. On the following day, Devine's supervisor told Devine to request William to rebid the job. William did not know on what date he faxed the bid on behalf of defendant to Brooks Brothers, although William admitted that defendant company's records indicated fax transmissions from defendant to Brooks Brothers in New York on June 26.

On June 26, William issued a bonus check for $97,904 to himself and bonus checks to six or seven other employees, only one of whom did not join defendant. He also issued paychecks from plaintiff's account to himself and Sharon and 12 or 13 employees. Maloney testified that he did not know these bonus checks were being issued and that the paychecks should not have been issued until June 28, the regular payday. Plaintiff's corporate minutes, dated June 11, approved bonuses to officers and key employees payable July 27, 1990.

On the morning of June 27, William gave Maloney his formal resignation and informed Maloney that he was leaving to operate a competing business. Maloney learned on that same day that several employees were leaving plaintiff to join defendant company. Mahoney learned on the morning of June 27 that plaintiff lost the White Sox account.

On June 28, Maloney and Mahoney learned that large checks were coming in to plaintiff's bank and that the account was nearly overdrawn. They requested a loan and a stop payment order on William's $97,000 bonus check, although the order came too late. On July 26, Maloney and Mahoney received bonus checks, as authorized by the June 11 minutes, but redeposited them into plaintiff's account. On August 1, Mahoney loaned plaintiff $70,000 to meet payroll expenses.

Since June 27, 1990, plaintiff has not been awarded any contracts from Gannett, Richmond Development, or Capitol Construction, despite Maloney's efforts to solicit business.

Maloney testified that several jobs originally awarded to plaintiff were reawarded to defendant after June 27, and the documents relating to these and other jobs were later discovered missing from plaintiff's offices. Joe Ryan admitted that when he left to join defendant company, he took documents from plaintiff's offices.

Plaintiff's sales decreased from $1,456,333 to $819,772 from the last quarter of 1989 to the last quarter of 1990. Payroll also dropped from about $27,000 to $11,000 monthly from July 1989 to July 1990. In January 1991, plaintiff had 20 employees in the field and office, as compared to 46 prior to William's resignation.

Plaintiff introduced the following evidence purporting to show confusion between the two companies' names. Plaintiff has used the name "Cullen Electric Company" since 1960. Defendant assumed the name "Cullen Electrical Contracting Company" after obtaining approval from the Secretary of State on June 25 to do business under that name. Both companies are electrical contractors and maintain offices within 12 city blocks of each other. Gutierrez testified that plaintiff received numerous phone calls and pieces of mail for William and defendant company from September 1990 to the present time. Maloney indicated that plaintiff received invoices, bills and correspondence in October and November 1990 intended for defendant. Robert Devine of Capital Construction testified that his company sent several letters to plaintiff in November 1990 which were intended for defendant. Devine testified that William told him that he was leaving on the day prior to his resignation.

On appeal, plaintiff maintains that the trial court erred in denying those portions of plaintiff's preliminary injunction which sought to enjoin defendants from contacting or doing business with customers served by plaintiff prior to William's resignation and from performing ongoing work with customers defendant obtained from plaintiff through this unlawful conduct. Additionally, plaintiff urges on appeal that the trial court erred in refusing to enjoin defendants from using the name "Cullen" in their business name.

■ We first consider whether the trial court abused its discretion in refusing to enjoin defendants from contacting or servicing plaintiff's former customers pending a full trial on the merits. Under general principles of equity, a party seeking preliminary injunctive relief must establish: a lawful right needing protection; that irreparable harm will be suffered without the protection sought; an inadequate remedy at law; and a substantial likelihood of success on the merits. (*American National Bank & Trust Co. v. Carroll* (1984), 122 Ill. App. 3d 868, 462 N.E.2d 586.) A preliminary injunction is an extraordinary remedy which should be used sparingly, with due restraint, and only when the circumstances clearly require it. (*Hannan v. Watt* (1986), 147 Ill. App. 3d 456, 497 N.E.2d 1307.) Finally, because the decision to grant or deny such relief lies in the trial court's sound discretion and its findings may not be disturbed absent an abuse thereof (*The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273), our role on review is limited to considering whether the trial court abused its discretion. *Hough v. Weber* (1990), 202 Ill. App. 3d 674, 560 N.E.2d 5.

The trial court here found that William breached his fiduciary duty to and unfairly competed with plaintiff (and this finding appears proper), that plaintiff suffered irreparable harm to a protectable right, had no adequate remedy at law and showed a substantial likelihood of success on the merits. The trial judge, however, refused to grant plaintiff the requested relief because of the passage of time and the court's inability to effectively fashion an order to maintain the status quo, finding that it was not "possible" or "practical" to fashion an appropriate order that would transfer defendant's business to plaintiff.

■ We cannot find that the trial court abused its discretion in finding that it could not maintain the status quo. The purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of the case in order to maintain the last, uncontested status which preceded the controversy. (*Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 515 N.E.2d 1339.) In our opin-

ion, the trial judge properly decided within the bounds of his broad discretion that he could not fashion an appropriate remedy nearly six months after William resigned and formed his competing company. Although William resigned on June 27, plaintiff did not seek injunctive relief until September 1990, and the motion was not heard until January 18, 1991. By that time, defendant company's operations were in full force, bids with customers had been accepted and work was in progress. A judgment that would require defendants, six months after formation, to cease contact with plaintiff's former customers would penalize the customers.

■ Relying on *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 379 N.E.2d 1228, plaintiff also maintains that the trial court abused its discretion by balancing the equities and considering the passage of time. It is well established that the equitable doctrine of balancing the equities does not apply when defendant acts with full knowledge of plaintiff's rights and an understanding of the potential consequences. (*Gold v. Ziff Communications Co.* (1989), 196 Ill. App. 3d 425, 553 N.E.2d 404.) A court balances equities when it determines whether the burden on defendant outweighs the benefit to plaintiff if the injunction issued. (*ABC Trans National Transport*, 62 Ill. App. 3d 671, 379 N.E.2d 1228.) The trial judge here stated that William breached his fiduciary duty and impliedly recognized that William acted with full knowledge of plaintiff's rights and with an understanding of the consequences that would follow. If the trial court balanced the equities, such analysis was an abuse of discretion. However, in our opinion, the record does not indicate that the court considered whether defendant's burden would outweigh plaintiff's benefit. Plaintiff suggests that the following language by the court shows that it balanced the equities: "[T]o enjoin [defendant] now would make a bad situation worse and would probably wind up hurting the plaintiff, as I said, indirectly by not being able to have a recovery." The court here did not refer to defendant's burden, but rather to plaintiff's potential harm. The record simply does not indicate that the trial court balanced the equities or that its decision rested on such factor. Rather, the record unambiguously points to the passage of time and the impracticality of fashioning an appropriate order. *ABC Trans National Transport* does not preclude the court from considering the passage of time or its ability to make an effective order in its analysis, and we conclude that such analysis here was a proper exercise of discretion.

■■ ■ While we find that the trial court did not err in denying the request for a preliminary injunction, we believe that the court

erred in holding that there was not an adequate remedy at law. If there is an adequate legal or equitable remedy that will make plaintiff whole after trial, a preliminary injunction should not issue. (*Schwartz v. Coldwell Banker Title Services, Inc.* (1989), 178 Ill. App. 3d 971, 533 N.E.2d 1161.) A legal remedy is adequate when it is clear, complete, and is as practical and efficient in achieving the prompt administration of justice as is the equitable remedy. (*Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 515 N.E.2d 1339.) We believe that the injury plaintiff complains of, William's breach of fiduciary duty, would be capable of being measured and corrected by money damages, and, therefore, plaintiff's remedy at law is adequate. After a trial on the merits, plaintiff will be entitled to recover as damages the loss of profits which plaintiff suffered as a result of William's actions. (*Henry's Drive-In, Inc. v. Anderson* (1962), 37 Ill. App. 2d 113, 185 N.E.2d 103.) If the loss of future profits is also proved, there is no evidence that these could not be estimated with reasonable certainty by relying on plaintiff's many years of successful operation. (*Henry's Drive-In v. Anderson*, 37 Ill. App. 2d 113, 185 N.E.2d 103.) Finally, the court may consider other readily quantifiable elements of damage which were demonstrated by plaintiff in the trial court.

Moreover, although the court appeared to find the necessary elements present for injunctive relief, its findings are equivocal regarding the adequacy of the legal remedy. While the court found that no adequate remedy at law existed, the court also found:

> "The defendant is going to be allowed to compete but he may be responsible and liable for damages for the breach that the Court found to a lesser degree, and if there is a breach proven to the degree that is acceptable, as I said before, *the solution lies in money damages* \*\*\*." (Emphasis added.)

Therefore, although the court indicated that no legal remedy existed, the court also envisioned money damages as plaintiff's relief. We conclude that damages here could be calculated with reasonable certainty, and that plaintiff's injury could be adequately corrected by an award of money damages. Because we find that an adequate legal remedy existed, we conclude that the trial court's refusal to enjoin defendants from contacting or servicing plaintiff's former customers through the extraordinary remedy of a preliminary injunction was a proper exercise of discretion.

We next consider plaintiff's claim on appeal that the trial court abused its discretion in refusing to enjoin defendants from using the name "Cullen" in their electrical contracting business. Plaintiff claims that defendant's use of such name deceives customers in violation of

the Illinois Uniform Deceptive Trade Practices Act, which provides for injunctive relief when a party's trade practice creates a likelihood of confusion or misunderstanding. Ill. Rev. Stat. 1989, ch. 121½, par. 312.

During the pendency of the proceedings below, defendant voluntarily changed its name from "Cullen Electrical Contracting Company" to "Bill Cullen Electrical Contracting Company." In refusing to enjoin defendant's use of the name "Cullen," the trial court wrote:

> "In the opinion of the Court, although confusing, there was testimony concerning it. *** I think that to refuse to allow the use of the name Cullen in the business of the defendant would be an abuse in its new, modified form. Prior to the modification, I would agree that the names, notwithstanding it is a family name, were too similar to allow because of the length of time the plaintiffs had used the name, so because of the modification and the insertion of the Bill Cullen Electric, whatever, the relief in 5 will be denied."

Initially, we reject plaintiff's suggestion that the record shows that the trial judge found actual confusion by defendant's use of the name. Contrary to plaintiff's assertions, we believe that the court refers to "confusing" testimony, not to confusion resulting from use of the names. Read in context, the court indicated its belief that defendant's name, as modified, was not sufficiently confusing to award the injunctive relief requested by plaintiff.

■■ Under Illinois law, a plaintiff may seek injunctive relief under the theories of trademark or trade name infringement, or under the Uniform Deceptive Trade Practices Act. The test for trademark infringement in Illinois is likelihood of confusion, and such infringement is found where the evidence indicates a likelihood of confusion, deception or mistake by ordinary purchasers. (*Thompson v. Spring-Green Lawn Care Corp.* (1984), 126 Ill. App. 3d 99, 466 N.E.2d 1004.) Moreover, the term "likelihood of confusion" has the same meaning under the Uniform Deceptive Trade Practices Act as in trademark infringement cases. (*M-F-G Corp. v. EMRA Corp.* (N.D. Ill. 1985), 626 F. Supp. 699.) Evidence of actual confusion is not necessary to support injunctive relief, although such evidence weighs in favor of such relief. *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 466 N.E.2d 1004.

■■ We conclude that the trial court here properly refused to enjoin defendants from using the name "Cullen." *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.* (1892), 142 Ill. 494, 30 N.E. 339, supports our conclusion. In that case, defendant Milton Hazleton sold his inter-

est in plaintiff company, "Hazelton Boiler Company," in New York and subsequently opened a competing business, "Hazelton Tripod Boiler Company" in Chicago. Our supreme court found that the trial court properly refused to grant injunctive relief, focusing on the minimal potential of confusion when companies deal directly with their customers. The *Hazelton* court wrote: "In this way the liability of intending purchasers to be deceived into mistaking boilers of the defendant's manufacture for those of the complainant, if not wholly obviated, is reduced to the minimum." *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.*, 142 Ill. at 508, 30 N.E. at 345.

As in *Hazelton*, both plaintiff's and defendant's principals here deal directly with their customers, rather than working through retailers or middlemen. Nor is this a situation where a potential buyer might be confused by a product that is on a store shelf. As such, under *Hazelton*, it is unlikely that the parties' customers will be misled into confusing the two companies based upon the similar names. Further, as in *Hazelton*, the evidence here does not suggest that defendants intended or calculated to deceive plaintiff's customers into believing that they were dealing with plaintiff. Conversely, the record reveals that William told several customers that he was leaving plaintiff and forming a new company. Such evidence belies plaintiff's argument that William tried to mislead plaintiff's customers. Nor was evidence presented to suggest that any customers dealt with defendant believing it to be plaintiff. The mail sent to plaintiff for defendant or William does not necessarily prove actual confusion, but rather is a natural incident of moving.

Furthermore, we do not believe that the right to injunctive relief here is supported by the applicable, general principles of law, as recognized by this court (*Unichem Corp. v. Gurtler* (1986), 148 Ill. App. 3d 284, 498 N.E.2d 724), and as first acknowledged in *Mossler v. Jacobs* (1896), 66 Ill. App. 571, in which the court wrote:

"[N]o person is by the law permitted to use any mark, sign, symbol, *name*, device or other means, whereby he makes a false representation, or deceives as to his own goods, or as to the goods of another. * * *

* * * Fair competition in business is legitimate and promotes the public good, but an unfair appropriation of another's business by using his name or trade mark, or an imitation thereof *calculated to deceive the public*, is not permissible and will be enjoined by a court of equity." (Emphasis added.) (*Mossler v. Jacobs*, 66 Ill. App. at 574-75.)

We find that defendant's use of the name "Bill Cullen Electrical Contracting Company" does not constitute an "unfair appropriation" of plaintiff's name "calculated to deceive the public." (*Mossler v. Jacobs*, 66 Ill. App. 3d at 574.) We recognize that the two companies are rivals and that the competition between them is intense, especially given William's former affiliation with plaintiff and his conduct. However, fair competition without intent to deceive does not give rise to injunctive relief. (*Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.* (1892), 142 Ill. 494, 30 N.E. 339.) For the foregoing reasons, we conclude that the trial court did not abuse its discretion in refusing to enjoin defendant's use of the name "Cullen."

In summary, the trial court did not abuse its discretion in denying plaintiff's request to enjoin defendants from contracting or doing business with plaintiff's former or current customers, and from using the name "Cullen."

Accordingly, the judgment of the circuit court of Cook County is affirmed and the cause is remanded for further proceedings consistent with these holdings.

Judgment affirmed and cause remanded.

RAKOWSKI, P.J., and EGAN, J., concur.