L S B Z, INC., d/b/a Za Zu Designs, *et al.*, Plaintiffs-Appellees, v. SUSAN BROKIS, Defendant-Appellant.

Second District   No. 2—92—0310

Opinion filed November 17, 1992.

DUNN, J., dissenting.

Donald J. Parker, of Donald J. Parker, Ltd., of Downers Grove, for appellant.

Robert V. Borla and John C. North, both of Borla, North & Associates, of Downers Grove, for appellees.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Susan Brokis (the stylist), appeals from the trial court's grant of a preliminary injunction (see 134 Ill. 2d R. 307(a)(1)) in favor of her former employer, L S B Z, Inc., doing business as Za Zu Designs, a hairstyling salon, and Sam Segretto, co-owner with Raymond "Butch" Koubek of Za Zu (the salon). The preliminary injunction restrains the stylist from violating a covenant against post-employment competition with the salon. The stylist argues that the trial court's order must be reversed because (1) the salon failed to show that the noncompetition covenant protects any of its legitimate business interests; and (2) the salon failed to show a likelihood of success on the merits, as the covenant is an unenforceable adhesion contract. We reverse and remand.

The salon is located in Hinsdale, Illinois. The stylist began working for the salon in June 1986. She had no written contract with the salon until October 14, 1989, when she and Segretto, on behalf of the salon, signed an "Employment Agreement" (the agreement) providing, in relevant part, that "[a]fter termination of employment the Employee agrees not to be employed by any salon, firm or company or to engage in any competing business for himself/herself or others for a period of three (3) years from the date of termination within a ten (10) mile radius of the Employer's location at the time of termination."

On January 21, 1992, the salon filed a three-count complaint alleging the following. On or about December 31, 1991, the stylist, without giving the salon notice, terminated her employment with the salon. She was currently working as a hair stylist for the Caryl Richard Hair Salon (Caryl Richard) in Oak Brook, within 10 miles of the salon's Hinsdale shop. The salon never approved the stylist's job change. By violating the agreement, the stylist was unjustly depriving the salon of business.

Count I of the complaint alleged breach of contract. Count II alleged that the stylist's solicitation of the salon's customers was a tortious interference with the salon's contractual relationships. These two counts prayed for money damages. Count III alleged that the stylist's competition with the salon and her solicitation of the salon's customers were causing the salon irreparable injury for which it had no adequate remedy at law. Count III prayed for an injunction against the stylist's violation of the agreement.

The salon petitioned for a preliminary injunction to enforce the agreement pending a trial on the merits. The stylist filed written answers to both the complaint and the petition for a preliminary injunction.

On February 25 and 26, 1992, the court heard evidence on the petition. The salon called the stylist as an adverse witness. She acknowledged that, since January 3, 1992, she had been working for Caryl Richard, about five miles from the salon. The stylist never talked with Segretto or Koubek about how the agreement would affect her departure. She did give the salon notice that she was leaving on December 28, 1991. Before leaving, she told only a few clients, who were also close friends, of her move.

When the stylist left the salon, she had a full schedule of bookings for New Year's eve. Over the New Year's holiday, she called her clients, including those scheduled to see her on January 3, 1992, and told them of her new location. On her first day at Caryl Richard, the

stylist was almost fully booked; probably all the clients she saw that day were ones who originally were scheduled to see her at the salon that day.

The stylist started her work for the salon after becoming a licensed cosmetologist and working at another salon in Chicago. She signed no employment agreements of any kind until the October 3, 1989, agreement. In accord with company policy, the stylist began as an apprentice; she received an hourly wage and was not allowed to work as a stylist with clients of her own until the salon promoted her in April 1987. Thereafter, the salon paid her the standard 44% commission.

The stylist brought no clients with her. Thus, her first client was someone who called the salon and whom the salon's management referred to her under its "random referral" policy. Management encouraged the stylist to build up a loyal clientele. Eventually, she built up her clientele to the point where she could afford an apartment and thus no longer needed to live with her parents.

The stylist customarily obtained new clients by word-of-mouth from established clients. Relatively few of her new clients were women who called the shop and were referred to her under management's referral policy. These referrals occurred mainly during the Christmas season. The stylist could not have made a living solely from the clients that management referred to her. The stylist also sought clients by passing out business cards at social occasions. She did not say how many, if any, new clients she obtained this way. As a rule, clients scheduled appointments by calling the shop's reception desk, but occasionally the stylist's clients would call her directly to set up an appointment.

The stylist explained that, in her experience in the hairstyling trade, the customer's loyalty is generally to the individual hairdresser, not to the shop. A woman will stay with a particular hairdresser as long as that hairdresser does satisfactory work. Generally, a client who is not a first-time customer asks the shop for an appointment with a specific hairdresser. The stylist had developed a group of loyal clients who regarded her as their hairdresser. She worked hard at maintaining personal friendships with her clients and regularly sent them Christmas cards. The stylist never had a general list of the salon's clients but kept an appointment book with her particular clients' names and phone numbers.

The stylist acknowledged that, when a client pays for services, the client makes the check out to the salon, which then distributes 44% of the proceeds to the individual hairdresser. The salon also pays for

heat, rent and facilities and equipment other than the hairdresser's scissors.

Segretto and Koubek called a meeting of the salon's employees early in October 1989 and asked all their hairdressers to sign the agreement. The stylist did not remember if a copy of the agreement was available at the meeting. She did recall that Segretto and Koubek stated at the meeting that hairdressers who did not sign the agreement would not be considered loyal workers and would not get any new business directed their way. Segretto and Koubek did not promise any specific new benefit to hairdressers who did sign the agreement. However, the purpose of the agreement was to give signers preference over nonsigners in the referral of new clients.

The stylist explained that she signed the agreement because she felt under "duress"; if she did not sign, she would be out of favor with Segretto and Koubek and would be jeopardizing the clientele she was building. At the time she signed the agreement, the stylist had not considered working elsewhere. She acknowledged that, had she not signed the agreement, she could have switched employers or opened a new shop and taken all her customers with her.

Two of the hairdressers who worked for the salon at the time of the meeting did not sign the agreement. The salon did not fire either. One had since left the salon because, as a result of her not signing the agreement, management had stopped referring new clients to her. The other, Noreen Guy, was still working at the salon; Guy had long had the highest income of any hairdresser in the shop.

The stylist testified that she received random referrals at no greater rate after she signed the agreement than before. She acknowledged that her 1990 income was about $25,000, roughly a 20% increase over her 1989 income of about $20,500, but she attributed this increase to a normal growth in her business, not to management's directing extra first-time clients her way.

Shortly before she left the salon, the stylist had a "tearful conversation" with Segretto, explaining that she was going to work for Caryl Richard in violation of the agreement. Before leaving the salon, the stylist told a few close friends, who were also among her clients, that she would be changing employers. She also made a list of clients with whom she had appointments scheduled for January 3, 1992. After she quit the salon, she called these clients to tell them of her new location. She did not try to attract any of the salon's customers with whom she had not worked previously. The stylist never disparaged the salon. Clients who followed her to Caryl Richard did so by choice.

The stylist testified that, judging by the experiences of hairdressers who formerly worked for the salon, the majority of her clients would not patronize the salon if she left. However, most of her clients were housewives with small children and would not follow the stylist if they had to travel more than 10 miles. The stylist could not go on making her living as she had were she required to wait three years before working at a shop within 10 miles of the Hinsdale salon.

The salon next called Michael Gilberto, who had worked for the salon since 1980. Gilberto owned no share in the salon's Hinsdale shop, but he was a part owner of its Naperville location.

Gilberto recalled that the stylist attended at least part of the October 3, 1989, meeting where Segretto and Koubek told their employees about the agreement. At the meeting, all employees received a copy of the agreement. Segretto and Koubek did not insist that hairdressers sign the agreement immediately; they asked their employees to examine the agreement and consult with counsel.

The owners never said that anyone who did not sign the agreement would be terminated. Gilberto did not sign the agreement and was still working at the salon. Early in the 1980s, the salon had presented Gilberto and other employees with a similar agreement, which Gilberto also had refused to sign.

Gilberto denied that Koubek or Segretto ever told their employees that anyone who did not sign the agreement would not be allowed to participate in random referrals. Rather, the owners said that those who signed the agreement would be given more consideration and would have more clients referred to them. Since the meeting, Gilberto had not been deprived of random referrals. Rather, those who had signed the agreement were given first consideration. Only if no employee who had signed the agreement was available would a new customer be referred to Gilberto.

Raymond Koubek testified that, at the time of the hearing, the salon had about 25 employees at its Hinsdale shop. When defendant started to work for the salon, she was already a licensed hairdresser, as are all the salon's starting employees. As did all employees, the stylist began as an apprentice so that she could learn the salon's distinctive methods and techniques. The salon's training program differs from those offered by cosmetology schools, including instruction not only on hairstyling techniques, but also on personal relations with customers.

Koubek stated that in 1983, the salon presented its employees with an employment agreement similar to the one the stylist signed in

1989. Some employees signed the 1983 agreement and some did not. Most of those who did not were still with the salon.

On October 3, 1989, Koubek and Segretto asked their employees to sign the agreement. The stylist, all the other hairdressers and some assistants attended the meeting. Everyone there received a copy of the agreement. The owners never threatened anyone with termination for not signing the agreement, and several people stated at the meeting that they did not want to sign the agreement. The stylist did not sign the agreement until October 14, 1989; until then, she was free to take her clients with her to any new shop she joined. Even after signing the agreement, the stylist could leave the salon and solicit any clients she wanted as long as she worked more than 10 miles from the salon's Hinsdale location.

Koubek explained that, in 1989, he and Segretto decided to introduce the agreement because two hairdressers that the salon had trained had left to open a competing shop across the street. Also, since the last contract in 1983, Za Zu had acquired many new employees who were not under contract and were trying to build their clienteles. Koubek and Segretto thus decided to give preference in new client referrals to those who indicated their commitment to the shop by signing the agreement. At the October 3, 1989, meeting, they told their employees that hair stylists who signed the agreement would be put on a preferred list for new referrals. Nonsigners might still get new referrals, but the salon would not guarantee them.

Koubek testified that the company followed through on this promise of preferential treatment for "contracted" employees. He knew that receptionists were following his directions in giving new referrals to "contracted" employees, as the incomes of these employees had increased since they signed the agreement. Koubek stated that, after defendant signed the agreement, he directed the shop's receptionists to refer new clients to the stylist. He had no direct knowledge of any case where a receptionist specifically referred a new customer to the stylist. He believed that the stylist's income increased at a higher rate from 1989 to 1990 than it did from 1988 to 1989, although it was possible that, in 1989, the rate she charged her clients increased by 5%.

The agreement's 10-mile limitation was based upon a map Koubek and Segretto drew up for a Federal lawsuit about five years before the hearing. At the time of the Federal case, about 97% of the salon's Hinsdale customers resided within 10 miles of the shop, and about 65% within 5 miles. The proportion of the client base that came from between 5 and 10 miles of the shop had increased somewhat since Koubek and Segretto drew up the map. The three-year limitation was

based on the assumptions that, after that time, a former employee would be unlikely to contact her clients from the salon and these clients would probably not still be waiting for her services.

Although the salon's Naperville location was 13 miles from its Hinsdale shop, some clients did switch from one shop to the other. One employee who signed the 1989 agreement left the salon to open her own shop outside the 10-mile limit. About 20% to 30% of her clients followed her away from the shop, but the remaining clients stayed with the salon and were assigned stylists according to the terms of the agreement. However, when the stylist left the salon and started working about 3.6 miles away at Caryl Richard, about 99% of her regular clients stopped patronizing the salon. Koubek did not know how many of these continued with the stylist.

By the time the stylist left the salon, she had acquired, according to Koubek, a "mature-built" clientele, that is, she had about as many clients as she could handle. Her 1990 wages were normal for a fully active hairdresser. None of the stylist's clientele was generated "completely by her own efforts." Koubek did not know how many women came to the salon solely because they wanted the stylist to style their hair.

Acknowledging that the salon's Hinsdale shop would not have to close merely because the stylist left, Koubek stated that, given the shop's high overhead and fixed expenses, the loss of the income that the stylist had been generating would force the shop to "cut down on receptionists." Already, the salon had been forced to lay off some assistants.

Sam Segretto testified that all hairdressers, including the stylist, attended the October 3, 1989, meeting. Segretto and Koubek explained that no one who refused to sign the agreement would be fired. However, because those who signed the agreement would be committing themselves to the company, they would get preference in receiving referrals. The stylist received this preferential treatment from the time she signed the agreement.

On or about December 21, 1989, the stylist mentioned to Segretto that she would leave the salon. On December 23, 1989, Segretto asked the stylist why she was leaving. She did not explain why she was leaving or where she was going. Shortly after Christmas, the two met for lunch, and Segretto again asked the stylist why she was leaving. She reluctantly told Segretto that she was relocating to Caryl Richard. She had considered another salon farther away but found it unsuitable. The stylist admitted to Segretto that she was breaking the agreement.

Segretto explained that the salon does not advertise and therefore relies primarily on word-of-mouth for new business. When the stylist started to work for the salon, Segretto did not tell her that any clientele she built up would have to stay with the shop if she left. The agreement did not prevent the stylist from taking clients with her as long as she relocated more than 10 miles away or waited over three years. The salon does not keep track of who generates which clients, although it does record which stylist served each client on each occasion.

The salon pays each stylist a commission every two weeks. The salon, not the stylist, pays for liability insurance and is responsible for collections and for bad debts.

The stylist's first witness, Joanne Caiafa, testified that, although she worked for the salon in 1989, she did not receive a copy of the agreement at the October 3, 1989, meeting. She did not recall other employees receiving a copy of the agreement. Segretto and Koubek did not say that she could take a copy of the agreement home to show to a lawyer.

Caiafa asked Koubek and Segretto what the agreement promised employees. The two owners responded that the agreement would enable the employees to work in a "professional atmosphere" and that if the employees signed the agreement, Koubek and Segretto would "help us out." Based on this conversation, Caiafa decided not to sign the agreement. Caiafa recalled that the stylist attended the meeting.

The stylist testified in her own behalf. She did not recall whether she attended all of the October 3, 1989, meeting. She did not recall receiving a copy of the agreement at the meeting, or being told at the time that she could take the agreement home and show it to a lawyer. Koubek and Segretto said that hairdressers who did not sign the agreement would not be considered for new clients.

As the stylist recalled, she did not receive a copy of the agreement until October 14, 1989, the day she signed it, at an office meeting with Koubek. Segretto may have been present also. Koubek never told her that she would lose her job if she did not sign the agreement.

The stylist testified that she signed the agreement because she felt that she had no choice. She was just building up a good clientele and was afraid of losing status and favor with management.

The stylist testified that every year she worked at the salon her income went up because she was building her clientele. An increase of $5,000 per year in income was about typical. She was not as busy in 1991 as in 1990, but her income did rise. The fall in her activity was due to a midyear price increase that was not made at her insistence.

The stylist estimated that, since leaving the salon, she had serviced about 80% of her clients from the salon at her new location. The other 20% might yet come to see her at Caryl Richard.

In rebuttal, Sam Segretto testified that the stylist signed the agreement in his presence at the shop on October 14, 1989. Because that day was a Saturday, Segretto was positive that Koubek was not there when the stylist signed the agreement. The stylist walked into Segretto's office and signed the form in his presence.

The trial court granted the preliminary injunction. The judge announced the following fact findings. The stylist learned of the agreement at the October 3, 1989, meeting. On October 14, 1989, she signed the agreement of her own free will. There was no duress, and the agreement was not an adhesion contract. The stylist's client base was not fully developed in 1989. There was consideration for the agreement; the stylist did in fact receive the promised preference in referrals, even if her business did not increase overall. The salon had shown a clear and ascertainable right in need of protection, *i.e.*, its interest in its present customer base. The salon was threatened with irreparable injury and had no adequate remedy at law. The time and geographic limits of the agreement were reasonable.

On appeal, the stylist argues that the trial court abused its discretion in granting the preliminary injunction. She argues specifically that the manifest weight of the evidence shows that (1) the salon has not established that it has a clear interest in need of protection because the agreement serves no legitimate interest of the salon but is intended merely to restrain competition *per se*; (2) the salon has not demonstrated a likelihood of success on the merits because the agreement is an adhesion contract without consideration.

We reverse the trial court's judgment. We conclude that the salon has not made a sufficient showing of the necessary elements for preliminary injunctive relief.

The purpose of a preliminary injunction is not to determine controverted facts or the merits of the case. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386.) Rather, a preliminary injunction is intended to preserve the status quo pending a decision on the merits of the case. (*In re Adoption of Scraggs* (1988), 125 Ill. 2d 382, 388; *Cullen Electric Co. v. Cullen* (1991), 218 Ill. App. 3d 726, 732.) The status quo is the last peaceable uncontested status that preceded the litigation. (*Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 671; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 761.) Moreover, "[a] preliminary injunction is an extraordinary remedy used only in situations where an extreme

emergency exists and serious harm would result in the absence of the injunction." *Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 490.

■ To obtain a preliminary injunction, a plaintiff must establish that (1) he possesses a clearly ascertained right in need of protection; (2) he will suffer irreparable injury without the injunction; (3) there is no adequate remedy at law; and (4) there is a likelihood of success on the merits. (*Scraggs*, 125 Ill. 2d at 388; *Millard Maintenance Service Co. v. Bernero* (1990), 207 Ill. App. 3d 736, 743.) Because a preliminary injunction is designed to preserve the status quo pending a decision on the merits, the plaintiff need not carry the same burden of proof that is required to support the ultimate issue. (*Buzz Barton*, 108 Ill. 2d at 386.) To satisfy the first and fourth of these requirements, a plaintiff need only raise a fair question as to the existence of the right which he claims and lead the court to believe that he will probably be entitled to the relief requested if the proof sustains his allegations. (*Barton*, 108 Ill. 2d at 386, relying on *Nestor Johnson Manufacturing Co. v. Goldblatt* (1939), 371 Ill. 570; *Tyler Enterprises of Elwood, Inc. v. Shafer* (1991), 214 Ill. App. 3d 145, 151; *A.B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 791.) Whether to grant or deny a preliminary injunction is entrusted to the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision unless that decision is against the manifest weight of the evidence. *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15.

The stylist argues first that the salon failed to show that it had a protectable interest in enforcing the agreement. She correctly notes that covenants not to compete are in effect restraints on trade and will be carefully scrutinized to insure that their intended effect is not to prevent competition *per se*. (*Tyler*, 214 Ill. App. 3d at 149; *Pflug*, 206 Ill. App. 3d at 491.) The time and territorial restrictions of a covenant not to compete must be reasonable, and the covenant must protect a legitimate business interest of the employer. (*Millard Maintenance*, 207 Ill. App. 3d at 744; *Reinhardt*, 142 Ill. App. 3d at 15.) Whether a covenant not to compete is enforceable is a question of law, but one dependent on the particular facts of the case. *Pflug*, 206 Ill. App. 3d at 491; *A.B. Dick*, 159 Ill. App. 3d at 792; *Reinhardt*, 142 Ill. App. 3d at 15.

■ The stylist does not challenge the agreement's time and territorial restrictions. Therefore, the issue is whether the salon has adequately demonstrated a protectable interest. We conclude that the salon has not carried its burden of raising a fair question as to the existence of a protectable interest. Although an employer ordinarily has no protectable interest in its clients as such (*Reinhardt*, 142 Ill.

App. 3d at 15-16), a restrictive covenant may legitimately protect an employer's clientele against takeover by a former employee. (*Tyler*, 214 Ill. App. 3d at 150; *Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435, 443; *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 218.) Thus, a covenant not to compete is valid if (1) the employer has a near-permanent relationship with its customers and (2) but for her association with the employer, the employee would not have contact with the customers. *Arpac Corp. v. Murray* (1992), 226 Ill. App. 3d 65, 73; *Millard Maintenance*, 207 Ill. App. 3d at 747; *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 1051.

We first consider whether the salon adequately showed that it had a near-permanent relationship with its clientele. We believe that the salon has not made a sufficient preliminary showing of such a relationship.

Illinois courts have developed a set of objective factors to consider in determining whether an employer has a near-permanent relationship with its customers. These factors include (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships. (*Agrimerica*, 199 Ill. App. 3d at 443-44; *A.B. Dick*, 159 Ill. App. 3d at 793; *McRand*, 138 Ill. App. 3d at 1051-54.) The employer is not required to show that the customer relationship is perpetual or indissoluble, or that a near-permanent relationship exists with each customer. *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 723-24.

■ Application of the first objective factor, the length of time required to develop clientele, does not favor the salon. It is clear that the salon is not required to devote a great deal of time to develop customers. There is no indication that the salon must cultivate a potential client for a substantial period before that client will do business within the salon for the first time. This is contrary to the factual scenarios presented in *Agrimerica* and *McRand*, in which near-permanent employer-customer relationships were found. In *Agrimerica*, a sales director for an animal feed speciality products manufacturer testified that salespeople needed 6 to 12 months to win over a prospective customer and persuade him to purchase a product. (*Agrimerica*, 199 Ill. App. 3d at 444.) Likewise, in *McRand*, the president of a company that designed and coordinated management award programs for large corporations offered uncontradicted testimony that it took one

to three years to develop a major account before any business from that client would be forthcoming. *McRand*, 138 Ill. App. 3d at 1050.

The second objective factor, the amount of money invested to acquire clients, likewise cuts against the salon's claim of a near-permanent relationship with its customers. The salon does not invest a substantial amount of money to acquire clients. One of its owners testified that it does not even advertise, but, rather, relies on word-of-mouth for new business. To the contrary, in *Millard Maintenance*, in which a near-permanent employer-customer relationship was found, the record showed that the employer "devoted substantial resources to developing and maintaining a clientele." (*Millard Maintenance*, 207 Ill. App. 3d at 748.) In *Arpac*, another case in which a near-permanent relationship was established, the evidence was that the employer spent an "absolute fortune" on developing customers and maintaining their loyalty. (*Arpac*, 226 Ill. App. 3d at 73.) Although the salon claims to spend a substantial amount for the maintenance of its facilities, we do not believe this factor to be dispositive since any business open to the public has similar overhead expenses. Moreover, the salon's claim that its hairdressers supply only their scissors and their labor is disingenuous in that the stylists' hairdressing talents are what the customers come in for, not some product or special service produced by the salon and merely delivered via the hairdressers. Finally, the stylist was a licensed cosmetologist when she came to the salon; she was not trained exclusively by the salon. We do not believe that the supplemental training in hairstyling given to the stylist by the salon, or the instruction on customer relations, amounts to the necessary investment in developing clientele.

The third factor, the degree of difficulty in acquiring clients, does not favor the salon. The salon offered no evidence of any difficulties encountered in obtaining customers. As noted, the salon does not advertise, but relies primarily on referrals from persons currently being serviced by its hairdressers.

The fourth factor concerns the extent of personal customer contact by the employee. Here, the hairdressers who work at the salon enjoy close personal contact with the persons whom they service, and they possess knowledge of those persons' needs. However, we believe there is a fundamental difference between this case and cases in which this factor was found to favor the existence of a near-permanent employer-customer relationship. See *McRand*, 138 Ill. App. 3d at 1053; *Agrimerica*, 199 Ill. App. 3d at 445-46; *Tyler*, 214 Ill. App. 3d at 150.

In the cases just cited, customers came to the employer for a product or a service offered by the employer through its employee: in *McRand*, it was for business award programs, in *Agrimerica*, customers bought animal feed specialty products, and in *Tyler*, clients wanted the employer's lawn care products. The former employees sought to be enjoined in those cases were little more than sellers of the employer's products or services. Here, the salon has not proven a similar situation. Specifically, it has not shown that the persons who get their hair styled at the salon are its customers, rather than customers of the individual hair stylists who service them.

The stylist testified that she was told by the salon's owners that she was to build up a loyal clientele. She also testified that in her experience, customers are loyal to individual hairdressers more so than to the shops in which they work. One of the salon's owners testified that he did not inform the stylist that the clientele she built up would be considered the salon's customers. The salon had the burden of proving whose customers the shop patrons were. This it did not do, even considering the reduced burden of proof necessary for the issuance of a preliminary injunction. Absent such proof, this fourth factor does not favor the salon.

Likewise, the fifth factor, the extent of the employer's knowledge of its clients, does not cut in favor of the salon. One of the salon's owners testified that the salon does not even keep track of whether a customer is generated by itself or by a hairdresser. Moreover, the salon offered no evidence that it possesses knowledge of clients' special needs or wants. Although individual hairdressers allegedly do possess such knowledge, that fact does not render this case similar to cases like *Arpac*, *Millard Maintenance* or *McRand*, in which the employees' knowledge of customer needs was found to support the employer's claim of a near-permanent relationship with its customers. (*Arpac*, 226 Ill. App. 3d at 73; *Millard Maintenance*, 207 Ill. App. 3d at 748; *McRand*, 138 Ill. App. 3d at 1052-53.) As we previously noted, we find the salon's relationship with its hairdressers, and thus with its customers, to be significantly different than the typical employer-employee relationship which deals with an employer's product rather than an employee's services.

Finally, the salon has not met its burden with regard to the sixth and seventh factors, the duration of the customers' association with the employer and the continuity of employer-customer relationships. The problem again lies with the salon's failure to establish that it, rather than the stylist, has a proprietary interest in the business of the persons who get their hair done by the stylist. Even assuming

that those persons are the salon's customers, the salon did not make a sufficient showing with regard to the sixth and seventh factors when compared with other cases in which a near-permanent relationship has been found.

In *Arpac*, the court found that the employer had a near-permanent relationship with its customers, many of which had an association with the employer in excess of 10 years. The former employee sought to be enjoined had worked for the employer for only three years. (*Arpac*, 226 Ill. App. 3d at 70, 73.) In *Millard Maintenance*, testimony established that two of the employer's clients had been affiliated with it for more than 15 years, another client had been a customer for over 36 years, and another customer had been using the employer's services in excess of 50 years. The employer's seven largest clients made up 70% of its business. The former employee sought to be enjoined had worked for the employer for under 8½ years. (*Millard Maintenance*, 207 Ill. App. 3d at 740, 743.) The court found that a near-permanent employer-customer relationship existed. (207 Ill. App. 3d at 747-48.) Similarly, in *Booth* (48 Ill. App. 3d 213), the employer had developed a clientele over a three-year period and the former employee had been employed for only 13 months. (48 Ill. App. 3d at 215-16, 219.) This fact supported the finding that a near-permanent relationship existed. 48 Ill. App. 3d at 219.

In contrast, the case at bar contains no evidence that the salon had steady customers who only began to have their hair cut by the stylist when she became employed there. Rather, the evidence raises the inference that the stylist was referred a relatively small number of clients who called the salon, perhaps as first-time customers, and that she then built a clientele through referrals to her by those clients.

We believe this case is much like the cases of *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, and *Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, in which no near-permanent employer-customer relationship existed. The evidence in *Reinhardt* established that the former employee sought to be enjoined had solicited the majority of her customers "not *because* of her association with [the employer], but rather, through her own efforts on [the employer's] behalf and in furtherance of her association with it." (Emphasis in original.) (*Reinhardt*, 142 Ill. App. 3d at 17.) In *Pflug*, the evidence likewise showed that the defendant/former employee had himself obtained many of the customers the employer sought to prohibit him from contacting. (*Pflug*, 206 Ill. App. 3d at 494.) Here, the majority of the stylist's customers allegedly came directly from referrals by persons

whose hair she had styled rather than from a list of long-standing customers of the shop.

■■ We thus turn to the second part of the test: whether the employee would have had contact with the customers absent her association with the employer. This part of the test arguably favors the salon since the stylist brought no clients with her when she started there. We think it is far from clear, however, that the stylist would not now be servicing some of the same clients had she originally gone into competition with the salon in the same general location. The evidence that a hairdresser's clients will leave a shop when the hairdresser does and follow her within a radius of approximately 10 miles before they return to a shop closer to their homes implies that customers' allegiance is first to convenience, then to an individual hair stylist, and then to a shop.

Nevertheless, given the salon's reduced burden of proof on the issue of a protectable interest, we will assume that the stylist would not have had contact with her customers if she had not been hired at the salon. Given our conclusion, however, that the salon has not raised a fair question as to its claim of a near-permanent relationship with its customers, the assumption does not alter our resolution of this cause.

■■ We find that the issuance of the preliminary injunction was against the manifest weight of the evidence. While we do not approve of the stylist's actions, we find that the extreme remedy of a preliminary injunction is not warranted. (See *Reinhardt*, 142 Ill. App. 3d at 15 ("[P]laintiff must show injury to its legitimate business interests separate and distinct from defendant's breach of the covenant [not to compete] to secure enforcement thereof").) Our decision eliminates the need to discuss the stylist's claim that the agreement she signed with the salon is an unenforceable contract of adhesion.

The judgment of the circuit court of Du Page County is reversed and the cause remanded.

Reversed and remanded.

McLAREN, J., concurs.

JUSTICE DUNN, dissenting:

I respectfully dissent. I disagree with the conclusion of the majority that the salon has not carried its burden of raising a fair question as to the existence of a protectable interest.

I believe the salon did adequately show it had a near-permanent relationship with its clientele. The majority correctly conclude that Illinois courts have developed a set of objective factors to consider in determining whether an employer has a near-permanent relationship with its customers. My disagreement with the majority, however, is their application of these factors to the facts of this case.

These factors include (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships. (*Agrimerica*, 199 Ill. App. 3d at 443-44; *A.B. Dick*, 159 Ill. App. 3d at 793; *McRand*, 138 Ill. App. 3d at 1051-54.) The employer is not required to show that the customer relationship is perpetual or indissoluble, or that a near-permanent relationship exists with each customer. *Preferred Meal System v. Guse* (1990), 199 Ill. App. 3d 710, 723-24.

Applying the *McRand* factors here, I find sufficient evidence of a near-permanent relationship between the salon and its clients. The first three factors, taken together, do not cut clearly in favor of either party. The length of time that the salon takes to develop customers appears relatively brief. There is no indication that a hairstyling shop such as the salon must cultivate a potential client for a substantial period before that client will do business with the employer for the first time. (See, *e.g.*, *Agrimerica*, 199 Ill. App. 3d at 444 (employer's salespeople needed 6 to 12 months to develop sufficient confidence on the part of prospective customers and to persuade them to buy products); *McRand*, 138 Ill. App. 3d at 1051 (designer of management incentive and award programs for corporations normally required one to three years of contact with client before any business was booked for that client).) The salon does not appear to invest a great deal per client beyond the maintenance of the shop's facilities. However, this cost is substantial, as the stylist supplies only her scissors and labor. The difficulty of acquiring clients is unclear from the record.

However, the remaining *McRand* factors, particularly the extent of personal contact between employee and client, do strongly favor the salon. Here, there was testimony that the salon aided defendant (and other stylists) not only in developing specialized techniques, but in cementing durable relationships by learning and attending to the personal desires of each client. Our courts have repeatedly recognized that intensive contact between the employee and the client, helping to

bind the client to the employer for as long as the employee works for the employer, is a weighty consideration in favor of finding a near-permanent employer-client relationship.

*McRand* noted that in a highly competitive business, personal contact between employee and customer is important to maintaining long-term customer relationships. Businesses that settle for transitory clienteles do not bother to personalize the relationship between employee and client or to develop extensive knowledge of client needs, because the "[e]mployees' extensive and specific knowledge of customers is unnecessary in a business where the customers are transitory" (*McRand*, 138 Ill. App. 3d at 1053). Applying this principle to the facts before it, the *McRand* court emphasized that the employees' close working relationships with customers and knowledge of particular customers' needs was strong evidence of near-permanent employer-customer relationships.

Similarly, in *Agrimerica*, the court emphasized that the defendant-former employee developed close working relationships with customers, visiting them regularly and winning their personal trust. *Agrimerica*, 199 Ill. App. 3d at 445-46.

In *Tyler Enterprises of Elwood, Inc. v. Shafer* (1991), 214 Ill. App. 3d 145, the court emphasized that the employer's business was highly competitive and that, because the defendant-employee had extensive contact with customers, he "received invaluable information including the knowledge of the customer's individualized needs. As a matter of policy, [the employer] put a premium on developing extremely close working relationships between its employees, like [the defendants], and its customers." (*Tyler*, 214 Ill. App. 3d at 150.) In the case at bar, the testimony of *both* parties strongly supports a similar conclusion. See also *Millard Maintenance*, 207 Ill. App. 3d at 748 (employer and its sales staff, including defendant, "made an effort to develop *** close personal relationships" with customers); *Guse*, 199 Ill. App. 3d at 723 (employer, "doubtless through the efforts of the individual defendants themselves, had established a reputation for service, quality and reliability" with customers); *A.B. Dick*, 159 Ill. App. 3d at 793 (defendant-employee was "the central contact between plaintiff and its customers").

In the case at bar, the personalized nature of the employer's services, including defendant's attention to the individual needs of clients and her development of long-term relationships of trust with her clients—ways of doing business that the salon encouraged and provided guidance in—militates in favor of the trial court's finding that plaintiff and its clients had a near-permanent relationship.

Defendant argues that the evidence at the hearing demonstrated that a client's loyalty is to the stylist rather than to the shop. Assuming this to be so, I conclude that this simply demonstrates that, as long as a stylist stays at the shop, the clients will be steady customers of that shop. This appears to be exactly the case at bar, not only as to defendant, but also as to other stylists (such as Michael Gilberto and Noreen Guy), who appear to have built up steady client bases over the years. The typical relationship between the salon and a client apparently is not transitory; clients are not anonymous faces who casually patronize the salon part of the time and a variety of other shops other times, depending on convenience or whim. Thus, the duration and continuity of customer associations—the sixth and seventh *McRand* factors—cut strongly in plaintiffs' favor.

Defendant may not use the fact that customers followed her when she quit the salon as evidence that the salon lacked a long-term relationship with its clients. Insofar as defendant's own covenant violations cut short the relationships between the salon and its clients, defendant would be asking us to make her covenant violations self-validating. (See *Agrimerica*, 199 Ill. App. 3d at 447.) As the cases I have cited tend to show, covenants not to compete become most important to employers precisely where there is a danger that employees who leave the business will take clients along with them. This fact does not establish that the covenants are invalid; to the contrary, the legitimate interest that employers have in such covenants is to prevent employees from taking over customers through the contacts with those customers that the employee has made while working for the employer. *Tyler*, 214 Ill. App. 3d at 150, relying on *House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32.

For the reasons just stated, I am of the opinion the salon carried its burden of raising a fair question as to the existence of a protectable interest. I find the issuance of the preliminary injunction was not against the manifest weight of the evidence. The judgment of the trial court should be affirmed.